STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RAYMOND L. BENNY AND EDITH J. BENNY, DEFEND-ANTS-APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MICHAEL A. ZICCARDI AND LILLIAN M. ZICCARDI, DEFENDANTS-APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MICHAEL J. HUBERTY AND MARY V. HUBERTY, DE-FENDANTS-APPELLANTS.

Argued November 21, 1955—Decided December 19, 1955.

*Mr. James M. Davis, Jr.,* argued the cause for the appellants (*Messrs. Powell & Davis,* attorneys).

*Mr. Harold Kolovsky,* Asst. Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General. *Mr. David D. Furman* and *Mr. David M. Satz, Jr.,* of counsel on the brief).

The opinion of the court was delivered by

VANDERBILT, C. J. These three appeals were taken separately from convictions found against these defendants for illegal voting in the Borough of Avalon after separate jury trials in the Law Division of the Superior Court. We certified the appeals while pending in the Appellate Division of the Superior Court, and because they involve the same legal issues we will deal with them in a single opinion. The facts in the three cases differ in details as well as in the motives of the defendants, but they are similar in their ultimate import.

I.

THE BENNY CASE

These defendants were indicted for voting fraudulently in violation of *N. J. S. A.* 19:34–11 at the general elections held November 3, 1953 and November 2, 1954, and at the primary election held April 20, 1954; and for false voting in violation of *R. S.* 19:34–22 at the primary election held April 20, 1954 for the reason that they had not resided in this State for one year and in Cape May County for five months previous to these election dates as required by *Article* II, *paragraph* 3 of the 1947 Constitution of New

Jersey, and by *N. J. S. A.* 19:4–1. At the outset of the trial it was stipulated that the defendants did vote at the elections stated in the Borough of Avalon in Cape May County.

The defendants are husband and wife. They own a home in Erdenheim, a suburb of Philadelphia, Pennsylvania. The photograph in evidence shows it to be a rather substantial, attractive, brick one-family dwelling of the type to be found in many of the better suburban districts of a metropolitan area. They have lived in it since 1942. The house, we are told, is completely furnished and suitable for year-round occupancy. The records of the Philadelphia Electric Company, which supplies gas and electricity to the area, indicate that electric and gas service has been rendered at the Erdenheim address in the name of the Bennys continuously from July 15, 1942. An employee of the Bell Telephone Company of Pennsylvania showed that continuous telephone service has been rendered to the defendants at their Pennsylvania address from July 1, 1942 up to the present time. The telephone account records show substantial telephone usage throughout the entire year for the years 1952, 1953, 1954 and up to May 1955, including substantial additional toll charges for the summer months. These records also show that the defendants have had a telephone continuously since 1925 and that service has been supplied to them at two other Philadelphia addresses during this period.

The various records of the company by which Mr. Benny is employed all show his address as 820 Glendalough Road, Erdenheim, Pennsylvania. The Bennys jointly own an automobile which they registered with the Pennsylvania Bureau of Motor Vehicles in their names for the years 1953, 1954 and 1955 giving their address as 820 Glendalough Road, Erdenheim, Philadelphia, Pennsylvania. Both Mr. and Mrs. Benny hold Pennsylvania operator's licenses for these same years showing that same address. They have never held New Jersey automobile licenses nor ever registered their car in this State. Their income tax returns have all been filed in Philadelphia, Pennsylvania.

The United States mail carrier whose route includes the defendants' Pennsylvania address testified he has delivered mail to these defendants continuously since 1946 without interruption except during the summer months. He indicated that during the month of July in the years 1952, 1953 and 1954 Mrs. Benny in her own handwriting filed with the Philadelphia postal authorities requests for the temporary change of address to 2432 Harbor Avenue, Avalon, New Jersey. The official post office forms filed for the years 1952 and 1954 bear the additional indication that she will notify the postal authorities when to resume deliveries at the Pennsylvania address. One specifically says, "I will notify in Sept." This postman further testified that if mail was not removed daily from the mailbox at the Pennsylvania house he would notice it and he did not recall seeing any mail accumulate in the Bennys' mailbox.

The defendants' granddaughter, an infant, lives with them at their house in Pennsylvania and attends public school there. The school records indicate that she has attended regularly during the school terms since 1947, without interruption; that the child's address is 820 Glendalough Road, Erdenheim, and that Mrs. Benny is her grandmother and her guardian. Mrs. Benny explains that she is not the legal guardian of the child but by arrangement with her daughter, who lives in nearby Philadelphia, cares for the child and attends to her needs. But, she says that "when we have to come to Avalon or take any kind of trips anywhere her mother comes up and stays at our house."

Turning to the defendants' association with this State, we find that for a number of years they have owned a house at 2432 Harbor Avenue, in Avalon. It also is described as a rather substantial frame house, fully furnished, with many of the modern conveniences, centrally heated by a gas furnace thermostatically controlled.

The defendants use their Avalon house every weekend in May and early June, and continuously occupy it from late June through July and August, and every weekend in September. During this period of continuous occupancy in June,

July and August Mr. Benny says he came down to Avalon on Tuesday or Wednesday nights, sometimes both, would return Friday night and stay until Sunday night or Monday morning. During the remainder of the year they come to Avalon occasionally on weekends, sometimes staying several days at a time. They belong to several organizations there, such as the Avalon Yacht Club and the Avalon Fishing Club.

Their general pattern of living is further indicated by the testimony of others. The Bennys were seen at the Avalon address largely in the summertime and seldom in winter. The State Police periodically checked the house from May 26, 1954 on and through the winter of 1955. They found that until June 18, 1954 no one was there; after September 4, 1954 they likewise found no one there. The utility company records show that although service was never discontinued, there was a decrease in average consumption in the winter months. A milkman testified that he delivered milk to the Bennys only during the summer season. The Avalon postmaster indicated that the mail addressed to the defendants at Avalon was forwarded pursuant to their instructions to their Pennsylvania address from September through June of the following year. The Avalon Tax Collector sent, pursuant to the direction on his records, all tax bills for the Avalon property to the Erdenheim address.

As to the voting, Raymond Benny stopped voting in Pennsylvania in 1951 and began then to vote in Avalon. Edith Benny began to vote in Avalon two or three years prior to 1951. Since voting in Avalon the defendants claim that they have not voted anywhere else. There is no evidence to show otherwise and we accept that as a fact herein.

It appears that at the times of the elections giving rise to the charges herein these defendants came specially from their Pennsylvania home, possibly several days before, and returned immediately after casting their ballots.

At the termination of the evidence the defendants moved for and were denied a judgment of acquittal. The jury returned a verdict of guilty and each of the defendants was fined $500.

## The Ziccardi Case

These defendants were indicted on charges similar to those in the Benny case but with respect to the general election held November 3, 1953 and the primary elections held April 21, 1953 and April 20, 1954. At the opening of their trial it was stipulated that they did in fact vote in the Borough of Avalon on the dates specified.

The defendants are husband and wife. Prior to their marriage in Maple Shade, New Jersey, in 1942, both were residents of New Jersey. Michael Ziccardi says that "back in 1924 my parents moved from Philadelphia to Maple Shade when I was seven years old" and "I lived in Maple Shade with my parents until I became married to my wife Lillian." In 1941 Michael's father turned over to him a small grocery store business located at 2701 East Cambria Street in Philadelphia. The building in which the store is located is owned by Michael's father. The photograph and description in evidence shows it to be a three-story brick building; the grocery store occupies the ground floor and there are living quarters on the second floor and bedrooms on the third floor. The exact time when the defendants took up continuous residence at the Philadelphia house is not clear. But from 1951 on there seems to be no conflict in the record.

A representative of the Philadelphia Electric Company testified that electric service had been supplied to the East Cambria Street address upon the application of the defendant, Michael Ziccardi, continuously since 1944. There was similar testimony from a representative of the Bell Telephone Company of Pennsylvania. An employee of the Philadelphia Gas Works stated that cooking gas had been furnished to the East Cambria Street building upon Michael Ziccardi's application since 1951.

A representative of the Pennsylvania Bureau of Motor Vehicles testified that the records of her department showed that both defendants had applied for and received Pennsylvania operator's licenses for the years 1952, 1953 and 1954 and that Pennsylvania registrations for a Ford coupe auto-

mobile owned by Michael A. Ziccardi had been issued for the same years. The residence of the defendants listed on all their applications was 2701 East Cambria Street, Philadelphia, Pennsylvania. .

Lillian Ziccardi was born and raised in this State. For many years her father owned a house in Avalon on the ocean front in addition to a residence elsewhere. During the hurricane of 1944 the Avalon house was pushed off its foundation blocks by force of the storm and thereafter was moved to its present location on the corner of 61st Street and Second Avenue in Avalon. It is this house that she now owns, having acquired it in 1950 by reason of her father's death and through purchase of her sister's interest. It is a bungalow or cottage type, frame dwelling, of the kind usually found in that area. It has electricity, but no telephone, and is presently heated by gas installed within the past three years. Prior to that time the heating requirements were satisfied by kerosene burners.

A neighbor of the defendants, who resides the year around in Avalon related that during the winter months she did not see the defendants living there, although they did come down occasionally, and that they boarded up their house after the summer season. She stated that the Ziccardis' stay at the Avalon house during the summer was more or less continuous except for such time as they rented the house to others.

A representative of the Atlantic City Electric Company testified that it supplied electric service to the defendants at the Avalon house since 1950 and that during the years 1952 and 1953 the company received written requests, in the form of letters from Mrs. Ziccardi, to discontinue the service in the fall of those years. The request dated November 26, 1952 specifically states "I do not use the cottage during the winter months."

The tax collector and treasurer of the Borough of Avalon testified that the records of his office showed that tax bills covering Mrs. Ziccardi's property, which were usually issued in January and June of each year, were mailed to her at 2701 East Cambria Street, Philadelphia, Pennsylvania. He

was not sure whether the bills were sent there during the past three years, 1952, 1953 and 1954, but if not there they were sent to the previous address shown on the records—6218 Charles Street, Philadelphia, Pennsylvania. He said that occasionally the bills were picked up at his office but he had no specific recollection as to when.

The postmaster at Avalon testified that there is no house to house delivery in that town and that people receiving mail there had to come to the post office for it. If they had post office boxes it was put in them, and if not it was held in general delivery. In the summertime there were three employees other than himself to handle the volume of mail, but in the winter there was only one other. He recalled that the Ziccardis rarely received any mail there other than utility bills.

Lillian Ziccardi testified on her own behalf that she would stay in Avalon from March or April until November in each year, but that during the years 1952, 1953 and 1954, inclusive, she rented the house during July. She also stated that during the winter months she would come only to check on the house. She admitted living at the Philadelphia address on a continuous basis, at least from 1951, and when she voted in Avalon at the general election in 1953 and at the primary in 1954, she came directly from Philadelphia to vote and returned immediately thereafter. She also testified that when she became 21 years of age her father told her that it was time to vote and took her down to register; that she voted for the first time in Avalon and has been voting there ever since. It never occurred to her that she had no right to vote in Avalon, and no one ever questioned it until she was challenged in April, 1953. Mrs. Ziccardi voted in the two elections following that challenge. She stated that she always regarded Avalon as her home and Philadelphia only as a place of business.

Michael Ziccardi testified on his own behalf along the same general lines as his wife, including that their son has been regularly attending parochial school in Philadelphia for about four years. He admitted that he filed his net profits tax

returns with the City of Philadelphia and indicated thereon that he was a "resident." He admitted filing their federal income tax returns in Philadelphia. His explanation for obtaining his motor vehicle registrations and operator's licenses in Pennsylvania is that he uses his car in his business and the licenses are cheaper and more convenient to get in Pennsylvania.

Motions for judgment of acquittal made at the end of the State's case and at the end of the entire case were denied. The jury returned a verdict of guilty and the defendants were fined $500 each.

## THE HUBERTY CASE

These defendants were indicted on the same charges as the Bennys and Ziccardis, but specifically with reference to the general election of November 3, 1953 and the primary elections of April 21, 1953 and April 20, 1954; and as in the other cases it was stipulated that these defendants had in fact voted in Avalon on the dates specified in the indictment.

Michael J. Huberty is employed by the Radio Corporation of America in Camden, New Jersey, and has been with that company for 41 years. Prior to his marriage to the defendant Mary V. Huberty in 1952, he was a resident of Gloucester, New Jersey.

Mary V. Huberty is employed by the American Telephone and Telegraph Company in Philadelphia and has been with that company for 27 years. Mrs. Huberty was previously married to George Rennenberg, who died about 1942. At the time of her marriage to Michael V. Huberty in 1952 she owned in her own right, by virtue of her first husband's death, a two-story brick row type city house at 5728 Colgate Street, Philadelphia. Up to that time, she says, she always considered herself as a resident of the City of Philadelphia. In 1949 she bought a house in Avalon, New Jersey, looking forward to the time when she could request a pension and retire from work.

Following the marriage of these defendants, Michael went to live with his new wife at her Philadelphia house. The

employment records of the Radio Corporation of America show the residence addresses of this defendant prior to 1952 to be 705 Hunter Street, Gloucester, New Jersey. Since December 17, 1951 it is listed as 5728 Colgate Street, Philadelphia, Pennsylvania.

The personnel records of the American Telephone and Telegraph Company show the continuous residence of Mrs. Huberty at the same Philadelphia address on Colgate Street since at least 1939. The records of the gas, electric and telephone companies serving the Philadelphia house show substantial and continuous service during the years covered by the indictment. The records of the Pennsylvania Bureau of Motor Vehicles show that the defendant Michael Huberty was issued an operator's license for 1953 and 1954 and automobile registrations for the years 1952, 1953 and 1954, all of which indicated his address as 5728 Colgate Street, Philadelphia, and that the defendant Mary Huberty was also issued an operator's license for the years 1952, 1953 and 1954 showing that same address.

Especially significant is the fact shown by the State and admitted by Michael Huberty that a non-resident driver's license was issued by the State of New Jersey to Michael V. Huberty for the year 1953 and on this, too, he gave the Philadelphia address as his residence.

The United States mail carrier who delivered mail to the Colgate Street house testified that he had been delivering the defendants' mail at that place from February 1952, through 1954 continuously and without interruption.

Mrs. Huberty had a daughter by her first husband. This child's school records show that she was regularly in attendance at the Philadelphia public schools until December, 1954, and that her home address is listed as 5728 Colgate Street. It was also stated by the school representative that as far as the school district knew the child was a resident student. If she were a non-resident student, there would be some indication of it on the records because tuition would be charged.

Mrs. Huberty filed her federal income tax returns in Philadelphia while her husband, Michael, filed his in the Camden, New Jersey, district.

The Avalon house is described as a fully furnished, four-room bungalow, where the electricity and gas are continuously connected the year around. The utility companies serving the house indicate that gas and electric consumption is substantial during the summer and fall, but was none or within the minimum during the remainder of the year. The Avalon postmaster could not recall ever handling any mail for these defendants. The tax collector and treasurer of the Borough of Avalon testified that his records called for the mailing of all tax bills on the Avalon property to the defendants at the Philadelphia address.

The defendants claim that they occupy the Avalon house during their respective vacation periods and on weekends or days off in almost every week of the year. Mary Huberty states that the first time she ever voted was in Avalon in 1953 and has voted nowhere else since then. Michael Huberty also testified that after he began voting in Avalon he voted at no other place.

In this case no motions were made by the defendants either for dismissal or for a judgment of acquittal. The jury found the defendants guilty as charged and they were fined $500 each.

## II.

We have gone into detail in relating the factual circumstances of these three cases, because we believe it important that the law of the subject be clearly understood by all in its precise applications. Although the situations presented here are substantially different both in factual details and in the motives underlying the varying claims to actual residence they are alike in their ultimate effect. These cases will furnish guidance for the many cases of the same general nature which are presently pending. Basically the issues presented by these appeals and to which the principal arguments are directed are (1) whether "residence" as used in

the Constitution and statutes governing voting qualifications means "domicile," and (2) whether the absence of proof of guilty knowledge or improper motive bars the conviction of these defendants under the statutes violated.

*Article* II, *paragraph* 3 of our *Constitution of* 1947 reads:

"Every citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State one year, and of the county in which he claims his vote five months, next before the election, shall be entitled to vote for all officers that now are or hereafter may be elective by the people, and upon all questions which may be submitted to a vote of the people."

*N. J. S. A.* 19:4–1 provides in part that:

"Except as provided in sections 19:4–2 and 19:4–3 of this Title, every person possessing the qualifications required by Article II, paragraph 3, of the Constitution of the State of New Jersey and having none of the disqualifications hereinafter stated and being duly registered as required by this Title, shall have the right of suffrage and shall be entitled to vote in the polling place assigned to the election district in which he actually resides, and not elsewhere. * * *"

The statutes for violation of which the defendants were convicted provide:

"Every person not entitled to vote who fraudulently votes * * * shall be guilty of a misdemeanor." (*N. J. S. A.* 19:34–11)

"If a person not entitled to vote at any primary election as herein provided shall vote or offer to vote at such primary meeting or caucus knowing or having reason to believe himself not entitled to so vote, * * * such person shall be guilty of a misdemeanor and shall for each offense be imprisoned at hard labor for a term not exceeding three months or by a fine not exceeding one hundred dollars, or both." (*R. S.* 19:34–22)

Domicile has been variously defined as the place where a person "has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning," *Story, Conflict of Laws* (*8th ed.*), § 41, *p.* 40, or "the habitation fixed in any place, without any present intention of removing therefrom," *Putnam v. Johnson,* 10 *Mass.* 488, 501 (*Sup. Jud. Ct.* 1813),

and by Mr. Justice Heher, in *State v. Garford Trucking, Inc.,* 4 *N. J.* 346 (1950), where he said at *page* 353:

"For a natural person, domicile of choice is essentially a question of residence and intention—of *factum* and *animus*. Ordinarily, domicile includes residence; but one may have several residences or places of abode or business. The basic concept underlying domicile is that of home, although one without a home has a domicile assigned by the law. *Kurilla v. Roth,* 132 *N. J. L.* 213 (*Sup. Ct.* 1944). 'Domicile' in common usage has reference to the place where a person lives or has his home; the term is derived from the Latin '*domus*,' meaning 'a house; a dwelling house; a home; a domicil; a residence.' *Ballentine's Law Dictionary,* 400, 402. 'Domicile' and 'residence' are not convertible terms, although they are sometimes used interchangeably in legislative expressions. The polestar in each case is the intention of the law-making authority. *E. g. Brown v. Brown,* 112 *N. J. Eq.* 600 (*Ch.* 1933). See 28 *C. J. S., Domicile,* §§ 2, 10, *pages* 7, 14."

■ It is everywhere conceded that a person can have only one true domocile, which is synonymous with the common understanding of the word "home," *Stout v. Leonard,* 37 *N. J. L.* 492 (*E. & A.* 1874); *Cromwell v. Neeld,* 15 *N. J. Super.* 296 (*App. Div.* 1951).

■ Residence, on the other hand, though parallel in many respects to domicile, is something quite different in that the elements of permanency, continuity and kinship with the physical, cultural, social and political attributes which inhere in a "home" according to our accepted understanding, are missing. Intention adequately manifested is the catalyst which converts a residence from a mere place in which a person lives to a domicile. Where a person has two homes in which he lives and between which he divides his time, it is still his intention which creates one or the other as his domicile. 1 *Beale, Conflict of Laws,* § 10.3—not the same intention necessary to create a domicile out of a mere residence but such additional intention manifested by a desire to exercise at one of the places the rights growing out of a true domicile and to become subject to the accompanying obligations.

■ A person cannot actually live in one place for the comfort, convenience and social standing of himself and

his family and maintain a wholly distinct domicile in another place. The reliability of our elective processes stems from the fact that a voter will be directly affected by his own choice of candidates. The absence of any true and complete identity with the community and with all of the rights, privileges, duties and obligations that flow from the allegiance to it expected of a person domiciled therein, would soon destroy the very pillars upon which our popular system of government is founded.

The defendants all contend that the trial judge erred in construing the words "resident" and "resides" in the sense of and to mean "domiciliary" and "domiciled," and as a result committed reversible error in denying their motions for acquittal and in refusing to charge the jury according to their requests. The defendants recognize, as they must of necessity do, that the courts of this State have held, in voting cases, that words of residence are synonymous with domicile, *Cadwalader v. Howell,* 18 *N. J. L.* 138 (*Sup. Ct.* 1840); *State v. Atti,* 127 *N. J. L.* 39 (*Sup. Ct.* 1941); affirmed 128 *N. J. L.* 318 (*E. & A.* 1942); *State v. Pruser,* 127 *N. J. L.* 97 (*Sup. Ct.* 1941). But they urge that these cases are not controlling because none of them gives any reason or authority for saying that "domicile" is the intended meaning. For their own purposes, they chose to rely upon *State v. Perretti,* 9 *N. J. Super.* 97 (*App. Div.* 1950), a fish and game controversy, as being the more logical and better construction of the words "resident" and "resides." It is sufficient to say that neither the facts, the reasoning nor the result of the *Perretti* case in any way controls us in the case at bar. Here we have three cases involving the sanctity of the ballot and the integrity of election results, *State v. Fay,* 127 *N. J. L.* 77, 85 (*Sup. Ct.* 1941).

 It has long been held in this State that the residence requirements of the Constitution and the statutes mean that a voter must be domiciled in the State of New Jersey. *Cadwalader v. Howell,* 18 *N. J. L.* 138 (*Sup. Ct.* 1840); *State v. Atti,* 127 *N. J. L.* 39 (*Sup. Ct.* 1941), affirmed

*o. b.*, 128 *N. J. L.* 318 (*E.* & *A.* 1942); *State v. Pruser*, 127 *N. J. L.* 97 (*Sup. Ct.* 1941); *In re Erickson*, 18 *N. J. Misc.* 5 (*Cir. Ct.* 1939); *Brueckmann v. Frignoca*, 9 *N. J. Misc.* 128 (*Cir. Ct.* 1931); *Schweitzer v. Buser*, 15 *N. J. Misc.* 217 (*Cir. Ct.* 1936); compare *Jacobsen v. Gardella*, 22 *N. J. Misc.* 277 (*Sup. Ct.* 1944).

The *Cadwalader* case gave us our first expression on this particular issue. The facts are strong against the defendant's contention. There, the plaintiff, the owner of a farm in Mercer County, which previously to his ownership had been owned and occupied by his father and grandfathers for over a hundred years, had a practice of spending part of every winter in either New York or Philadelphia and had rented accommodations in those cities for this purpose. In the year 1838 he rented a house for a long term in Philadelphia for the purpose of these winter visits which lasted from December until May. The court found that there were acts of permanency exercised in Mercer County during all the time that the plaintiff stayed in Philadelphia, and pointedly remarked:

"When the statute required, that the voter should have resided in the county, &c., it meant that he should have had his home there. In the seventh section, the right to vote was limited to the township in which he usually resided, &c. It did not mean, however, that he must have eaten and lodged there continuously for the space of a year, to entitle him to his vote. It did not mean, that he was not to absent himself during the year, for special purposes of pleasure, or business, either with or without his family. It meant nothing more than that he should have his home, his residence, within the county, for such space of time. It is important therefore, that we understand what the law means by residence. The word residence, (fixed residence I mean,) is generally used as tantamount to, domicile; though I am not prepared to say whether they are or are not in all respects, convertible terms." (18 *N. J. L.*, at *page* 143)

Significantly, the court even in those days recognized that any holding other than that residence meant domicile would create a class of "political vagrants" and be seriously prejudicial to our elective system. As Mr. Justice Dayton stated:

"* * * The voter must at least have been a resident for a specified time, &c.; yet hundreds of the most intelligent and influential residents of the neighboring cities, are in the habit yearly of closing their city houses, and retiring with their families to their respective country seats, that they may escape the dust and heat of the city during the summer months. Almost every part of New Jersey is dotted with these country seats of the citizen; and has it ever been supposed, that by spending the summer with us, they were disfranchised at home? Such a doctrine would make an immense class of persons, (whose influence and stake in the community as property holders, are greatest,) mere political vagrants." (18 *N. J. L.*, at *page* 145)

This same attitude was reflected in the Constitutional Convention of 1844, see *Proceedings of the New Jersey State Constitutional Convention of* 1844 (1942), May 17, 1844, May 24, 1844. The *Constitution of* 1844 (*Article* II, *par.* 1) contained the same wording as to the qualifications on residence as our present Constitution. Significantly, the framers of the *Constitution of* 1844 were even then concerned with the possibility of people from other states coming over into New Jersey to vote in elections in which they had no legitimate interest in order to attempt to exercise some control over the result of elections in this State. Only true domicile begets kinship with the people of the community and their problems and results in the serious consideration of them, which is necessary to the existence of effective government.

In the case of *State v. Atti, supra,* 127 *N. J. L.* 39 (*Sup. Ct.* 1941), affirmed *o. b.,* 128 *N. J. L.* 318 (*E. & A.* 1942), a case involving a situation similar to the ones before us except for the fact that it involved residences within two counties of the State of New Jersey, in affirming the defendant's conviction the court stated, 127 *N. J. L.,* at *page* 41:

"The question in this case is whether the plaintiff-in-error was a resident of Morris County in the sense that he was domiciled there for a period of five months next before the election for which he registered and at which he voted. A person may have more than one residence but may not have more than one domicile. His permanent home is his domicile and the place of his domicile determines his right to vote. The domicile is the place of his abode where he has the present intention of remaining and to which, if absent, he intends to return."

A holding that a temporary or seasonal residence in this State is sufficient to satisfy the constitutional and statutory requirements, even though continued intermittently over a period of time, would result in serious consequences. Responsible voting can be expected only where voters voting at the polls owe allegiance to the state and locality wherein they are domiciled and wherein they exercise their franchise. The necessary attributes of domicile, i. e., sending children to local schools, being concerned with local problems, reading local newspapers, having knowledge of local needs and desires, and above all, having a genuine desire to accept the responsibilities incident to such status and make that "home" a better place to live, all become important factors to be considered in obtaining reliable results from popular elective systems.

"The ballot in the hands of the qualified voter is the means by which he exercises his inalienable right to give consent as to how and by whom he chooses to be governed. The honesty, integrity and inviolability of that ballot must be maintained," *State v. Fay*, 127 *N. J. L.* 77, 85 (*Sup. Ct.* 1941).

As a second ground for the reversal of their convictions, the defendants contend that the trial court generally misapplied the law with regard to knowledge as an element of the crimes charged. They concede that they are chargeable with knowing that the *Constitution of* 1947 (*Article* II, *par.* 3) says that they must be residents of this State for one year and in the county for five months, and that the statutes (*N. J. S. A.* 19:4–1 *et seq.*) require that they may vote only in the election district in which they "actually reside" and not elsewhere. But they say that they cannot be chargeable with criminal wrong for not knowing that residence means domicile and particularly so where there is nothing in the facts proven to indicate that they were motivated by any corrupt intent or profited personally in any way as a result of their voting in this state. We find no reversible error in the circumstances of these cases.

■■ Knowledge of the fact that he was not entitled to vote as he did is unquestionably a necessary element of each

of the offenses charged against these defendants, *State v. Moore*, 27 *N. J. L.* 105 (*Sup. Ct.* 1858); *State v. Halsted*, 39 *N. J. L.* 402 (*Sup. Ct.* 1877), affirmed 41 *N. J. L.* 552 (*E. & A.* 1879); *N. J. S. A.* 19:34–11; *R. S.* 19:34–22. It is an element which the State had the burden of proving, beyond a reasonable doubt, either by direct evidence or by facts from which it could be reasonably inferred that such knowledge existed, *State v. Atti*, 127 *N. J. L.* 39 (*Sup. Ct.* 1941), affirmed 128 *N. J. L.* 318 (*E. & A.* 1942); *State v. Pruser*, 127 *N. J. L.* 97 (*Sup. Ct.* 1941). But this knowledge is not to be confused with the knowledge that all persons are presumed to have of the law, its existence and effect; *ignorantia juris neminem excusat*. Of necessity, the defendants here conceded that they are bound by this principle. The knowledge we speak of here is *mens rea*, or a guilty knowledge that the acts committed are wrong. This the State must show and the jury must find, beyond a reasonable doubt.

█ It has long been held that guilty knowledge may be inferred from the defendant's conduct and the circumstances of the case, *State v. Western Union Tel. Co.*, 12 *N. J.* 468, 490 (1953), *certiorari* denied 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1953); *State v. Kuehnle*, 85 *N. J. L.* 220 (*E. & A.* 1913); *State v. Beavers*, 89 *N. J. L.* 370 (*E. & A.* 1916); *State v. Close*, 106 *N. J. L.* 321 (*E. & A.* 1930); and it is for the jury to decide whether it exists beyond the required reasonable doubt. *State v. Atti*, 127 *N. J. L.* 39 (*Sup. Ct.* 1941), affirmed on the opinion below, 128 *N. J. L.* 318 (*E. & A.* 1942), furnishes us with apt precedent. Chief Justice Brogan wrote at *pages 43–44* of 127 *N. J. L.*:

"The third argument is that there was no evidence that Atti knowingly voted illegally. * * * Now the indictment was found under a statute which denounces as a misdemeanor the act of anyone who shall solicit the registering of his name on a registry list, *knowing he is not a legal voter*, or who shall vote at an election *knowing he is not a qualified voter*. It is clear therefore that the State had the burden of proving facts from which the inference was reasonable that Atti had such knowledge. Knowledge, undisclosed, is something peculiarly subjective. But, like intention, it may, as here, become a fact question from conduct and circumstance

and thus be subject to legitimate inference. Atti, of course, is chargeable with knowledge of the fundamental law that he had to be a resident of, *i. e.*, domiciled in, the county in which he registered and voted, for at least five months next preceding such election. He is chargeable with knowledge of the fact that he could not go anywhere he liked in the state and vote unless he permanently lived there for the required time, and this brings us to the question of whether he had actually taken residence in Morris County for five months before the election with the intention of remaining there. The fact that he went back to Union City about October 1, 1938, even though he returned to the country place for weekends, the fact that his children went to school in Hudson County, and the fact that he came from Union City on election day, to vote in Morris County are circumstances and conduct from which the jury could legitimately impute knowledge to him that he was in fact domiciled in Hudson rather than Morris County. But the argument of the plaintiff-in-error begs this question by assuming completely that he was in fact domiciled in Morris County which was the issue in dispute. That issue being for the jury's consideration, it was not error to refuse to dismiss the indictment or to direct a verdict for the defendant."

■ In each of the three cases here the jury was appropriately charged that they must find beyond reasonable doubt that the defendants knowingly voted in a district where they knew they were not entitled to vote—a district in which they did not "actually reside." There being a jury question in each case on this fact alone, it was not error for the trial court to deny the motions for judgment of acquittal made in the Benny and Ziccardi cases. In all of the cases we find sufficient evidence from which the jury could reasonably infer that these defendants in fact knew that they had no right to vote as they did and therefore no basis exists for setting the verdicts aside, *R. R.* 1:5–1.

The judgments of conviction accordingly are affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.