## Miller v. U.S.F. & G. Co.

*Robert O. McQuaide,* for plaintiff.

*S. M. Raffensperger,* for defendant Selected Risks.

*F. Lee Shipman,* for defendant U.S.F. & G. Co.

*Robert Reed,* for defendant Motorists Mutual.

SPICER, *P.J.,* December 13, 1983 — The court is called upon to determine which of three insurance carriers is required to provide coverage for injuries suffered by a pedestrian who was struck by an automobile. The automobile was driven by a borrower who had permission to use the vehicle from someone other than the named insured. We decide this case on the basis of depositions, requests for findings of fact and conclusions of law, and argument by the parties.

## FINDINGS OF FACT

The court enters the following findings of fact:

1. Plaintiff is Kathy A. Miller, an individual.

2. Defendants are insurance carriers having possible duties of providing coverage as follows:

(a) United States Fidelity and Guaranty Com-

pany (USF&G) as carrier for Barbara Moose, record owner of a 1971 Buick Skylark automobile.

(b) Selected Risks Insurance Company (Selected Risks) as carrier for the father of the borrower driver.

(c) Motorists Mutual Insurance Company (Motorists) as uninsured motorist carrier.

3. On June 13, 1978, plaintiff, Kathy A. Miller, while a pedestrian in McSherrystown, Adams County, Pa., was struck and injured by a vehicle operated by Charles P. Cullison.

4. The vehicle operated by Charles P. Cullison was a 1971 Buick Skylark titled in the name of Barbara A. Moose.

5. The 1971 Buick Skylark (Buick) was insured at that time by Barbara Moose with USF&G.

6. Barbara Moose owned another vehicle and used it exclusively for her own purposes.

7. The Buick was chosen for purchase by Eileen Moose, was paid for by Eileen Moose with her own money, and was operated by her to the exclusion of her mother. Eileen Moose was the beneficial owner of the Buick with full possession and control. The title and insurance arrangement with her mother was solely for convenience.

8. Eileen Moose and Charles P. Cullison were dating each other for several months prior to and including the date of the accident.

9. Charles P. Cullison reasonably believed that the Buick was owned by Eileen Moose and subject to her possession and control.

10. On several occasions prior to June 13, 1978, Eileen Moose permitted Charles P. Cullison to operate the Buick with her as a passenger.

11. On June 13, 1978, Eileen Moose gave Charles P. Cullison the keys to the Buick with her express permission to operate the Buick to go to

Cullison's father's trailer in Spring Grove, Pa. At the time, she was working at Dunkin Donuts and expected that Charles would return before her shift was completed.

12. After picking up the Buick from Eileen Moose, Charles P. Cullison drove to the home of his friend, Anthony Schroll.

13. Thereafter, Charles P. Cullison and Anthony Schroll, as passenger, rode around McSherrystown until they came upon the idea of throwing eggs at various females who were congregating on the porch of a house located on a corner of the intersection of Main and Sixth Streets in McSherrystown.

14. Pursuant to the plan, Charles and Anthony drove to a Handy Mart on Main Street and then proceeded on Main Street to the aforesaid intersection. When they arrived at Main and Sixth Streets, Charles turned right onto Sixth while at the same time he and Anthony each threw an egg at the girls on the porch.

15. At that time and place, the Buick crossed over into the oncoming lane of travel and struck Kathy Miller where she stood talking to the driver of a vehicle stopped on Sixth Street in his lane of travel at a stop sign.

16. On June 13, 1978, Charles P. Cullison was 16 years of age and had a learner's permit.

17. On the same date, Anthony Schroll was 16 years old and had a junior license.

18. The USF&G policy excluded coverage for any person operating the vehicle without a reasonable belief that he was entitled to do so.

19. At the time of the accident, Charles P. Cullison reasonably believed that Eileen Moose had authority to validly give consent for the use of the Buick.

20. On or before June 13, 1978, Charles P.

Cullison had never received any information that would have informed him that the owner of the Buick did not permit him to operate the Buick on June 13, 1978.

21. Prior to April of 1978, Charles L. Cullison, the father of Charles P. Cullison, separated from his wife and left the marital residence located in McSherrystown to reside in York County, Pa.

22. In April of 1978, Charles L. Cullison and his wife were divorced. By written agreement general custody of his two daughters and son (Charles P. Cullison) was with the mother while he enjoyed temporary custody rights.

23. In the school year 1977-78, Charles P. Cullison attended Delone Catholic High school in McSherrystown. He had completed his sophomore year and was on summer vacation as of June 13, 1978.

24. Prior to June 13, 1978, Charles P. Cullison and his parents intended that he move into his father's home in York County during summer vacation and remain with his father for the 1978-79 school year.

25. Prior to June 13, 1978, Charles P. Cullison visited his father and occasionally stayed overnight. However, he did not primarily live there until after June 13, 1978.

26. On June 13, 1978, Charles L. Cullison was insured with Selected Risks Insurance Company which provided that any family member residing with him was also insured.

27. Suit was filed by Kathy A. Miller against Charles P. Cullison and others in the Court of Common Pleas of Adams County, Pa. No. 80-S-291.

28. Charles P. Cullison reasonably believed he had permission to drive the car to his father's house but could not have reasonably believed he had per-

mission to use the car as used at the time of the accident.

29. Charles P. Cullison was a member of the household of and resided with both his mother and his father at the time of the accident.

## CONCLUSIONS OF LAW

The court enters the following conclusions of law:

1. The omnibus exclusion clause in the Moose USF&G policy relieves USF&G from the responsibility of providing coverage.

2. The clause in the Cullison's Selected Risks policy extending coverage to members of the household residing with the named insured requires Selected Risks to provide coverage in this case.

3. Charles P. Cullison was not uninsured at the time of the accident and Motorist does not have a duty of providing coverage.

## DISCUSSION

USF&G has argued that cases dealing with exclusion clauses requiring consent should be applied in this case. Specifically, it has contended that we must find a connection between the named insured and the borrower to find a reasonable belief that use was permissive.

This is not the first time that we have considered and rejected such an argument. Our discussion in Motorists Mutual Insurance v. State Farm Mutual Insurance Company, 24 Adams Co. L. J. 77 (1982) discussed the differences between tests applied to omnibus clauses requiring consent and those requiring a reasonable belief that one had consent. The latter test is much more liberal and takes into account a variety of circumstances, including the

borrower's age, personality, and social milieu, and the effect of such attendant influences on his judgment and mind as may be credibly discerned from the proofs. The test is subjective and we cannot judge the belief unreasonable because it came from consent conferred by his girlfriend. The evidence in this case clearly shows that Cullison reasonably believed he had permission to use the car when he took it.

Our analysis of the reasonableness of his belief at the time of the accident requires us to examine views pertinent to consent tests. There are three such views. The strict rule holds any use beyond that for which consent is given to be beyond a policy's coverage. The liberal rule holds that as long as the vehicle was acquired with consent any subsequent use is covered. The moderate view, adopted in Pennsylvania* excludes from coverage substantial but not minor deviations from the scope of use for which permission was given. 7 Am Jur 2d, Automobile Insurance, §264, 265, & 266 (1980). Discussions concerning the moderate view indicate that "[s]ince the distinction between a minor and major deviation is a matter of degree, no hard and fast rules can be laid down . . ." *Id.* It is obvious that the rule is one of reasonableness and would be pertinent for consideration in this case. More latitude is given use by friends and relatives than to servants and factors include distance, time, and purpose.

Giving this case the proper latitude, we could easily find Cullison to have reasonably believed he had permission to drive around McSherrystown with a friend. We cannot, however, under any circumstance, find that he could have reasonably believed

---

* LaRoche v. Farm Bureau Mutual Insurance Company, 335 Pa. 478, 7 A.2d 361 (1939).

he had permission to use the car to throw eggs at pedestrians.

By excluding USF&G, we are required to consider circumstances of Cullison's living arrangements. The testimony in this regard is vague but it is clear that Cullison primarily resided with his mother prior to the accident. The father, Charles L. Cullison, said he did not consider his son to be a part of his household at the time of his accident. Be that as it may, we find that the legal implications of the living arrangements were such that Cullison resided both with his father and with his mother and was a member of the household of each.

The problems attendant to situations involving parental separations and minor children have led to two lines of decisions concerning insurance coverage. See 93 A.L.R.3d, Liability Policy — Additional Insured, §6(a) and (b), beginning at page 441 (1979). The only case in Pennsylvania that has been brought to our attention and which deals with similar facts is Stewart v. Automobile Underwriters' Company, Inc., 54 D. & C. 2d 62 (1971). That case established a requirement that the driver be actually living in the household with the intention that it be his permanent household.

We do not think this test accurately reflects the law in Pennsylvania. We think Pennsylvania follows the line of cases holding that a child can be a resident of both households.

Construction of similar insurance provisions was considered in New Jersey with the court making the following statements.

The policies of insurance here involved extended coverage to relatives of the named insured and his spouse "if residents of his household." The terms contained in the clause under review do not have any absolute meaning. Their meaning may vary ac-

cording to the circumstances in each case. Consequently, in construing the language "residents of his household," we do so in light of the well established principles set forth in Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7, 170 A.2d 800 (1961). In Mazzilli our Supreme Court stated:

"Household is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits. True, it is frequently used to designate persons related by marriage or blood, who dwell together as a family under a single roof. . . . But it has been said also that member of a family need not in all cases reside under a common roof in order to be deemed a part of the household. (at 8, 170 A.2d at 804) See also, Crossfield v. Phoenix Ins. Co., 77 N.J. Super. 476, 479, 187 A.2d 20 (App. Div. 1962).

A "resident" is generally defined as "One who has his residence in a place." Black's Law Dictionary (4th ed. 1951), 1473; 2 Bouvier's Law Dictionary and Concise Encyclopedia (3rd rev. 1914), 2920. Our courts have recognized the difference between the meaning of the words "residence" and "domicile," and have held that they are not convertible terms. State v. Garford Trucking, Inc., 4 N.J. 346, 353, 72 A.2d 851 (1950). In State v. Benny, 20 N.J. 238, 119 A.2d 155 (1955), the Supreme Court defined these terms and pointed out the underlying difference as follows:

Domicile has been variously defined as the place where a person "has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning," Story, Conflict of Laws (8th ed.), §41, p. 40, or "the habitation fixed in any place, without any present intention of removing therefrom," . . . .

· · ·

Residence, on the other hand, though parallel in many respects to domicile, is something quite different in that the elements of permanency, continuity and kinship with the physical, cultural, social and political attributes which inhere in a "home" according to our accepted understanding, are missing. Intention adequately manifested is the catalyst which converts a residence from a mere place in which a person lives to a domicile. Where a person has two homes in which he lives and between which he divides his time, it is still his intention which creates one or the other as his domicile. 1 Beale, Conflict of Laws, §10.3—not the same intention necessary to create a domicile out of a mere residence but such additional intention manifested by a desire to exercise at one of the places the rights growing out of a true domicile and to become subject to the accompanying obligations at 250-251, 119 A.2d at 161; Miller v. United States Fidelity and Guaranty Co., 127 N.J. Super. 37, 316 A.2d 51, 54 (1974).

This analysis was also followed by our Superior Court. It was said:

The Courts of this Commonwealth have historically recognized the classical definitions of the words domocile (sic) and residence. Domicile being that place where a man has his true, fixed and permanent home and principal establishment, and to which whenever he is absent he has the intention of returning.

Residence being a factual place of abode. Living in a particular place, requiring only physical presence.

Though the two words may be used in the same context, the word resident as used in the policy, without additional words of refinement, i.e., permanent, legal, etc., would carry the more transitory meaning.

The appellant having written the contract, any ambiguity in its terms will be construed against it. Miller v. Prudential, 239 Pa. Super. 467, 362 A.2d 1017 (1976).

Krager v. Foremost Insurance Company, 304 Pa. Super. 390, 393-394, 450 A.2d 736, 737-738 (1982).

There is no wording in the Selected Risks policy that required Cullison to have primarily resided with his father or that he be a permanent resident. The ambiguity will be resolved against the carrier.

The attached order is entered.

## ORDER OF COURT

And now, this December 13, 1983, the judgment of the court is that the policy issued by Selected Risks Insurance Company provided coverage for the use of the vehicle by Charles P. Cullison on June 13, 1978.