**Victor KRZEWINSKI et al., Plaintiffs,**

**v.**

**George F. KUGLER, Jr., Attorney General of the State of New Jersey, et al., Defendants.**

**Civ. A. No. 1011–71.**

United States District Court, D. New Jersey.

Feb. 4, 1972.

---

494

Hughes, McElroy, Connell, Foley & Geiser, by Richard J. Hughes, Richard Catenacci, Newark, N. J., and Abram A. Lebson, Englewood, N. J., for plaintiffs.

George F. Kugler, Jr., Atty. Gen. of New Jersey, by Theodore A. Winard, Trenton, N. J., Samuel J. Zucker, Irvington, N.J., for Town of Irvington.

Thomas P. Kelly, Orange, N.J., for City of Orange.

Joseph L. Conn, Paterson, N.J., for City of Paterson (amicus curiae).

Joseph D. Lintott, Bloomfield, N.J., for Town of Bloomfield.

Before ADAMS, Circuit Judge, and ANGELLI, Chief Judge, and COOLAHAN, District Judge.

ADAMS, Circuit Judge.

This three-judge panel has been convened pursuant to 28 U.S.C. § 2281 to determine the constitutionality of the New Jersey police and firemen tenure

statute, N.J.S.A. 40:47–5. The statute provides that municipal police and firemen shall continue in their respective offices and employment "during good behavior, efficiency and *residence in the municipality wherein they are respectively employed.*" (emphasis added). Plaintiffs attack the residency requirement of the statute as an unconstitutional denial of their right to migrate. In this class action plaintiffs represent New Jersey municipal police and firemen who claim to have been injured because various municipalities have impermissibly extracted a surrender of this important constitutional right in exchange for permanent employment.[1] Plaintiffs, therefore, ask this Court to enjoin permanently the state Attorney General as well as all municipal officers throughout New Jersey from enforcing N.J.S.A. 40:47–5.[2]

Although no evidentiary hearing was held, it was conceded that numerous instances of severe hardship have developed because of the enforcement of the residency requirement. From the affidavits which have been filed it appears that many police and firemen regard local housing in highly industrialized and urbanized areas as either too highly priced or practically uninhabitable. Some have been prompted to move away from their respective municipalities for personal reasons, such as caring for sick relatives who for reasons of health are unable to move to the locality. Domestic problems appear to arise occasionally as a result of the conflict between a wife's understandable regard for the welfare of her family and the husband's obligation and devotion to duty that binds him to a particular locale. The New Jersey courts have, in addition, determined that dual residency will not satisfy the requirement of N.J.S.A. 40:47–5. "Residency" within the statute is more than nominal domicile; it must be the place which the policeman or fireman regards as his home—the place at which his family lives. Mercadante v. City of Paterson, 111 N.J.Super. 35, 266 A.2d 611 (Chan.Div.1970), aff'd 58 N.J. 112, 275 A.2d 440 (1971). Finally, the Court is not presented with isolated or dramatized examples of hardship. We understand from the affidavits submitted that perhaps one of three New Jersey police and firemen are now residing in violation of N.J.S.A. 40:47–5, and that the plaintiffs before us are truly representative of the class which they purport to represent.

### A. Jurisdiction

Plaintiffs invoke the jurisdiction of the federal court under 28 U.S.C. § 1343(3), (4) because the action is brought pursuant to the federal Civil Rights Act, 42 U.S.C. § 1983. Our jurisdiction to determine the issues

---

1. The Court has been advised that most municipalities throughout the state have treated N.J.S.A. 40:47–5 as an enabling act authorizing the enactment of the municipal residency requirement by ordinance. As we understand them, these ordinances raise identical constitutional issues and we so treat them hereinafter.

2. Plaintiffs also assault the durational residency requirement of N.J.S.A. 40:47–3 which requires that police and firemen reside in the municipality in which they are employed six months before they may be appointed. No individual plaintiff before this Court claims injury by the application of the durational rule. As this Court today upholds the permanent residency requirement it may well be that rather than comply with N.J.S.A. 40:47–5, many police and firemen will lose their present jobs and seek employment in the municipality to which they will or already have moved. But until that application is made, the controversy over N.J.S.A. 40:47–3 is clearly not ripe for adjudication. An action against a state attorney general to end enforcement of an allegedly unconstitutional law is premature where the prospective plaintiff has yet to perform certain acts necessarily prerequisite to that enforcement procedure. Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Here it is quite possible that non-complying police and firemen will choose to move back into the municipalities in which they work or to embark upon a new career. Rather than render an advisory opinion on the constitutionality of N.J.S.A. 40:47–3, we await the arrival of a properly interested party before this tribunal.

presented by the complaint has not been questioned by any of the defendants, and we are of the opinion that initial federal jurisdiction exists in this case. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

We then must consider our jurisdiction as a three-judge panel to determine the constitutionality of N.J.S.A. 40:47-5. This Court was convened under 28 U.S.C. § 2281, which provides that the enforcement, operation or execution of a State statute may not be enjoined on the ground of its unconstitutionality unless application for injunctive relief is heard and determined by a three-judge district court.

■ While a municipal ordinance standing alone is not a "statute" within the meaning of 28 U.S.C. § 2281, Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967); Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed. 2d 643 (1967); Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928), if ordinances are in fact a state-wide application of law embodied in or authorized by a state statute, this requirement of 28 U.S.C. § 2281 is satisfied. City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945). Clearly, N.J.S.A. 40:47-5 and the many ordinances enacted thereunder comprise a "compendious summary of various enactments" by which the State of New Jersey has given its sanction to the residency requirement. A. F. of L. v. Watson, 327 U.S. 582, 592, 66 S.Ct. 761, 90 L.Ed. 873 (1946). Whether the statute and local ordinances enacted thereunder in fact represent the

implementation of a truly state-wide policy or scheme is a determination which a federal court must make by examining the practical aspects of the operation of such laws. Simon v. Landry, 359 F.2d 67 (5th Cir. 1966), cert. denied, 385 U.S. 838, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966); Hyden v. Baker, 286 F.Supp. 475 (M.D. Tenn.1968); Israel v. City Rent and Rehabilitation Administration, 285 F.Supp. 908 (S.D.N.Y.1968). Although the residency rule is not necessarily applicable in every New Jersey municipality,[3] this Court is satisfied that its operation and enforcement is sufficiently state-wide to justify its classification as a "statute" within the meaning of 28 U.S.C. § 2281, thereby vesting jurisdiction to decide this case in a three-judge court.

■■ Even though we have the power to adjudicate the matter before us, the question whether we should exercize that power or abstain, merits a brief discussion. Beginning with the case of R. R. Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court has articulated the various factors which govern the abstention doctrine. Generally, a federal court should, in its discretion, abstain when a decision based on state law is necessary to the disposition of the case, and when the state question involves unclear state law or a matter of paramount interest to the state. *See e. g.*, Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); R. R. Comm'n v. Pullman Co., *supra.* The state law involved in this case has been twice sustained and definitively interpreted by the New Jersey courts. Mercadante v. City of Paterson, 111 N.J.Super. 35, 266 A.2d 611 (1970) aff'd 58 N.J. 112, 275 A.

---

3. N.J.S.A. 40:47-3.3 allows municipalities to waive any residence requirement compelled by state law if adherence "would seriously impede its ability to establish and maintain competent personnel for its police force or paid fire department." N.J.S.A. 40:47-4 similarly allows waiver of requirements compelled by state law in

order to appoint experienced policemen temporarily. The Court understands from oral argument, however, that few municipalities have taken any of these options, and we do not believe that their existence disturbs the otherwise state-wide nature of the municipal residency rule.

2d 440 (1971); Kennedy v. City of Newark, 29 N.J. 178, 148 A.2d 473 (1959). Further, the question here is not a matter of "paramount interest" to the state as that term has been interpreted in Kaiser Steel Corp. v. W. S. Ranch Co., 391 U.S. 593, 594, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968). Under these circumstances, then, abstention would not be proper and we proceed to the merits.

### B. The Constitutional Issue

The claims asserted by the plaintiffs rest basically on alleged denials of their right to equal protection and their right to travel as guaranteed by the Constitution. The equal protection argument attacks the state-enforced classification which differentiates between resident and non-resident police and firemen, while the right to travel contention assails the power of the state to prohibit policemen and firemen from moving if they are to retain their jobs.

### 1. Test to be Applied

■ The traditional test applied to determine whether a state statute comports with the Equal Protection Clause of the Fourteenth Amendment has been stated on many occasions by the Supreme Court: "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective * * *. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), citing Kotch v. Board of River Port Pilot Comm'rs., 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947); Metropolitan Casualty Ins. Co. of New York v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1935); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911); Atchison, T. & S. F. R. Co. v. Matthews, 174 U.S. 96, 19 S.Ct. 609, 43 L.Ed. 909 (1899).

■ Recently, however, the Supreme Court has made fairly clear that when the differentiation adversely affects other fundamental constitutional rights, the test to be applied is much more stringent. The statute may be upheld only if the state is able to demonstrate a compelling interest in maintaining the difference in treatment between the classes. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Bates v. City of Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

Our initial inquiry, therefore, will be to determine whether the State of New Jersey must demonstrate a reasonable basis for the classification or a compelling interest in it. For this purpose, the discussion should begin with Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the first Supreme Court case to recognize the existence of a right to travel independent of the Commerce Clause of the Constitution. Compare Shapiro v. Thompson, supra, with Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

The plaintiffs in Shapiro were individuals who had been welfare recipients in their home states. When they moved into new states as residents, they were denied welfare benefits because they had not lived in the state continuously for at least one year. The test to be utilized in determining the validity of the attacked statutes depended on whether the right to travel was a fundamental constitutional guarantee. Relying on the language in United States v. Guest, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), that, "in any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution," the Shapiro Court went on to state: .

> "But in moving from State to State or to the District of Columbia appellees [plaintiffs] were exercising a constitutional right, and any classification

which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." Shapiro v. Thompson, *supra* 394 U.S. at 634, 89 S.Ct. at 1331 (emphasis in original).

If the right to travel has been similarly penalized in our case, we will test the validity of the police and fireman residency requirement based on whether a compelling state interest exists. We are immediately confronted with one basic difference between *Shapiro* and this case —*Shapiro* dealt only with a right to travel interstate, while here the right to travel intrastate is in issue. Two Circuits have examined the right to migrate within a state, and both have concluded that the right is fundamental within the meaning of *Shapiro*. King v. New Rochelle Municipal Housing Auth., 442 F.2d 646 (2d Cir. 1971); Cole v. Housing Auth., 435 F.2d 807 (1st Cir. 1970). "It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." King v. New Rochelle, *supra* 442 F.2d at 648 (footnote omitted). The soundness of this conclusion is even more apparent when it is considered together with the refusal of the Supreme Court in *Shapiro* to link the right to travel with any specific clause of the Constitution, commerce or otherwise. Shapiro v. Thompson, *supra* 394 U.S. at 630, n.8, 89 S.Ct. 1322. *See* Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

That the State of New Jersey, by attempting to enforce the residency requirement, would be penalizing the right to travel to a substantial degree is also clear. The affidavits submitted by the

plaintiffs demonstrate that a number of policemen and firemen have already moved out of their employer municipalities and that they will lose their jobs as a consequence of their exercising their right to travel. It is also apparent that a number of individuals would travel were it not for the threat of losing employment. We find, therefore, that the impact of the challenged statute implicates sharply enough the right to travel to require our application of the compelling state interest test. *See* Shapiro v. Thompson, *supra* 394 U.S. at 629, 634, 638, 89 S.Ct. 1322; Cole v. Housing Auth., *supra* 435 F.2d at 809–811.

2. *The Compelling State Interest*

■ Not every interference with the right to travel and migrate necessitates voiding the offending law. Any invalidation must be accompanied by a careful examination of the governmental interests asserted and a conclusion that the interests are not "compelling" in the constitutional sense, Graham v. Richardson, *supra*; Shapiro v. Thompson, *supra*; Affeldt v. Whitcomb, 319 F.Supp. 69 (N.D.Ind.1970); Keenan v. Board of Law Examiners, 317 F.Supp. 1350 (E. D.N.C.1970), or that compelling interests exist which may be preserved by a regulatory scheme doing less violence to the constitutional rights of travel and association. Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L. Ed.2d 992 (1964); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

Certain interests, not seriously asserted here, such as the "public coffer" theory and the right-privilege dichotomy have been offered in the past to justify a residency requirement for public servants which over the years have lost not only their compelling nature, but also their constitutionality.[4]

4. The "public coffer" theory states that the salaries paid to civil servants ought to recirculate within the economy of the municipality that pays those salaries. In this way, municipal funds are preserved for a municipality's own residents. But this theory, as best expressed in People v.

Crane, 214 N.Y. 154, 108 N.E. 427, aff'd sub nom. Crane v. New York, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218 (1915), was sharply rejected by the Supreme Court in Shapiro v. Thompson, *supra*. Municipalities may not tie economic benefits in with contributions made to the municipal econ-

Absent these doctrines, the question before this Court is not whether a man has a right to be a policeman or fireman and simultaneously insist upon his right to live where he wishes,[5] but rather whether the interests of a municipality in asking a policeman or fireman to surrender his constitutional right to travel and migrate in exchange for his job are sufficiently compelling to justify the creation of a working class of immobiles.

The truly important interests to be realized by the residency requirement demand recognition by the Court of the modern pattern of urban disruption and dissipation prevalant today.[6] Rioting and looting have occurred in major New Jersey cities, such as Newark, Paterson, Plainfield and more recently in Camden and Hoboken. A substantial number who have studied the problem attribute much of this lawlessness to a deeply rooted disrespect for an absentee police force which governs by day and resides afar at night. According to the proponents of this view, a policy of requiring fire department and police force residency would tend to increase the presently low degree of community cooperation uniformly observed by law enforcement officials. While this Court would not impute a conscious or deliberate neglect of duty to a policeman or fireman living apart from his municipal employer, we recognize that reasonable men could conclude that a total disengagement between work hours and personal life could detrimentally affect his attitude toward the community and the people he serves. If with each nocturnal escape he manages to leave city problems behind, it may be just a matter of time before the officer devel-

---

omy. *Id.* at 632–633, 89 S.Ct. 1322. The public coffer doctrine is merely a natural outgrowth of the once held belief that public employment is not a right, but a privilege, which the State confers in all its beneficence. The New Jersey courts have relied upon this right-privilege doctrine and its corollary, the public coffer doctrine, to uphold state laws and municipal ordinances requiring public servants to reside in the municipality which pays their salaries. Kennedy v. City of Newark, 29 N.J. 178, 148 A.2d 473 (1959); Mercandante v. City of Paterson, 111 N.J. Super. 35, 266 A.2d 611 (Chan.Div.1970), aff'd 58 N.J. 112, 275 A.2d 440 (1971). Any reliance upon these outdated, and apparently unconstitutional theories is disavowed by this Court. Other courts have likewise read *Shapiro* to command such disavowal. Leger v. Sailer, 321 F.Supp. 250 (E.D.Pa.1970) aff'd sub nom. Graham v. Richardson, *supra;* Donnelly v. City of Manchester, 274 A.2d 789 (N.H. 1971).

5. Kennedy v. City of Newark, 29 N.J. 178, 148 A.2d 473, 476 (1959), relying upon McAuliffe v. City of Bedford, 155 Mass. 216, 29 N.E. 517 (1892).

6. One such interest is not realized by requiring police and firemen to live in a city merely for the sake of being close to work. Police and firemen must be able to respond to emergencies timely without fail. It is precisely during times of natural disaster, riot, or public conflagration that commuting to work would be most difficult. Many police and firemen who commute from afar in northern or southern New Jersey rely on such major arteries as the New Jersey Turnpike and the Garden State Expressway would find it impossible to respond promptly to their respective stations should inclement weather close those highways. Numerous state courts, including those of New Jersey, in upholding residency laws, have found the geographical proximity argument very persuasive. Salt Lake City Fire Fighters Local 1645 v. Salt Lake City, 22 Utah 2d 115, 449 P.2d 239 (1969); Berg v. City of Minneapolis, 274 Minn. 277, 143 N.W.2d 200 (1966); Kennedy v. City of Newark, *supra;* Marabuto v. Town of Emeryville, 183 Cal.App.2d 406, 6 Cal.Rptr. 690 (D.C.App.1960). Even if the proximity argument might pass a test of reasonableness, it could not withstand scrutiny under the compelling state interest test. The capacity of police and fireman for emergency response is not necessarily impaired by residency outside municipal bounds because, as plaintiffs argue, geographical proximity cannot logically be equated with municipal borders. The state interest in proximity might be satisfied much more rationally and fairly by a time or distance radius computation. Setting the bounds for residence at the city limits is not compelled by a valid state interest in proximity and approaches being arbitrary.

ops at least an unconscious disdain for the city and its residents. The mutual advantages of residency required by N. J.S.A. 40:47–5 and similar laws was noted by The President's Commission on Law Enforcement and the Administration of Justice, Task Force Report, The Police (1967).

> Aside from convenience, local residence avoids the impression that the police come from the outside world to impose law and order on the poor and minority groups and also avoids the risk of police isolation from the needs, morals and customs of the community
>
> . . . .
>
> Perhaps, more effectively than any amount of training, off duty contact between police and the people they service prevents the stereotyping of police by citizens and of citizens by police . . . .
>
> Wherever possible, police officers should be encouraged to live within city limits for it is important officers have a feeling of commitment to the city, above and beyond the obligation to police it.

See also, Governor's Select Committee on Civil Disorders, State of New Jersey, Report for Action 163–164 (1968) (recommending residency as a statewide police requirement); Detroit Police Officers Association v. City of Detroit, 385 Mich. 519, 190 N.W.2d 97 (1971). Thus, New Jersey has a valid interest in promoting what it has called "identity with the community" among police and firemen. Mercadante v. City of Paterson, *supra*, 111 N.J.Super. at 40, 266 A.2d at 614, citing State v. Benny, 20 N.J. 238, 252, 119 A.2d 155, 162 (1955).

Two additional considerations magnify the need for direct community association by these uniformed employees. Residency places the off-duty officer physically within the municipality in which he is authorized to perform his duties. This immediate discharge of duties is not to be confused with the exigencies of quick, emergency recall, for it is not the call from the station house but the chance observations of a neighbor or of the officer himself which will prompt his off-duty actions.[7] As the Supreme Court of Michigan recently noted, there is no substitute for physical presence:

> "There is a special relationship between the community policed and a policeman. A policeman's very presence, whether actually performing a specified duty during assigned hours, or engaged in any other activity during off-duty hours, provides a trained person immediately available for enforcement purposes . . . .
>
> They are charged with law enforcement in the city of Detroit, and obviously must be physically present to perform their duties."

Detroit Police Officers Association v. City of Detroit, *supra*, 190 N.W.2d at 98. The added presence of off-duty police in an urban municipality to the on-duty force, even if the off-duty police are rarely called upon to act, will undoubtedly have a deterrent effect on crime. Additionally, the chance associations and encounters which follow from residence and which may lead to invaluable sources of information will go far towards making each resident policeman a more knowledgeable, qualified officer.

A portion of the above reasoning may be inapplicable to firemen, and the discussion of community relations might have greater relevance to police work. We are unconvinced, however, that the governmental interest in firemen's residency is attenuated beyond the constitutional limits described above. To the community, the fire department is another link in the chain of law enforce-

---

7. The value of the off-duty policemen may be seen in the case of Peters v. New York, decided sub nom., Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L. Ed.2d 917 (1968). Peters, while in possession of burglar's tools and apparently attempting to burglarize an apartment, was arrested by an off-duty policeman on the stairway of the policeman's apartment house. Officer Lasky was alerted to the potential crime when he heard a noise at his door.

ment. Firemen wear uniforms which fact, in the eyes of those dissatisfied with the establishment, makes the firemen part of a para-military group determined to do them harm. Were firemen also to live outside the municipality, the tension which already exists might easily be heightened. Investigations by the fire department are not at all uncommon, and criminal sanctions are frequently brought into play when local fire ordinances are enforced. *See, e. g.,* Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). New Jersey's recent experiences with mass conflagration, begining with the summer riots of 1967, should be sufficient to persuade us that firemen, like police, are on the public firing line. Firemen as well as police are routinely harassed, attacked and even shot at during the course of their duty throughout the nation's cities. Whatever this Court's attitude might be, urban communities clearly choose to put firemen and police in the same class. The need to develop community rapport and to put an end to misunderstanding and intolerance is therefore apparently just as compelling a state interest with regard to firemen as with policemen.[8]

Although the residency requirement is thus found to be valid, several points require comment. Throughout plaintiffs' briefs N.J.S.A. 40:47–5 has been assailed as a statute originally designed to accommodate the old system of political dole. They argue that the reasons now forwarded by defendants "are a compilation of afterthoughts—the chimerical creations of the resourceful advocates—in an attempt to imbue these patronage statutes with legitimate governmental objectives."[9] We may assume as true the proposition that association and identification with the community were not the original purposes for requiring residency under N.J.S.A. 40:47–5. However, residency was not the only requirement for police or firemen service even in the early laws,[10] and in searching for a compelling interest to sustain this law, our inquiry is limited to present interests, not those which may or may not have surrounded the law initially. Thus, Sunday closing laws have been upheld when the legitimate objective of providing a uniform day of rest was not initially the aim of the law, and when in fact the objective at the time of enactment was proscribed by the Establishment and Free Exercise Clauses of the Constitution. Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L. Ed.2d 563 (1961); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L. Ed.2d 393 (1961).

Moreover, the viability of the doctrine of substantive due process has long ended. No longer may we, as a federal court, sit in judgment of the wisdom of a state legislature. This concept of judicial restraint began in the dissents of Mr. Justice Holmes when he stated:

"I think the proper course is to recognize that a state Legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain."

---

8. The New Jersey Legislature has recently passed legislation doing away with the residency requirement. The bill has been on the Governor's desk since mid-December and it appears that action might not be taken by him until March, 1972. In these circumstances, a decision on the constitutional issues is appropriate, and we leave to the Governor his resolution of the political issues.

9. Plaintiff's Answering Brief, at 1.

10. N.J.S.A. 40:47–3 has been frequently amended since its passage as N.J.Laws 1917 c. 152, Art. XVI, § 3, at 359. It requires that applicants be citizens of the United States, residents of the municipality in which they will serve for six months prior to appointment, of sound body and health, of good moral character, literate, and able to write and speak English fluently.

Tyson & Brother United Theatre Ticket Officers v. Banton, 273 U.S. 418, 446, 47 S.Ct. 426, 433, 71 L.Ed. 718 (1927) (dissenting opinion). It is now the judgment of the Supreme Court that, "Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." Ferguson v. Skrupa, 372 U.S. 726, 729, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). Although the wisdom of the legislation under attack in this suit may be subjected to serious criticism, see note 8, *supra,*

"* * * Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to 'subject the state to an intolerable supervision hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.'"

*Id.* 730, 83 S.Ct. at 1031, citing Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) (footnote omitted). Thus absent a direct collision between the legislation and the Constitution we are constrained to uphold the judgment of the legislature rather than to substitute our own.

Continuing with plaintiffs' contention concerning attribution of legislative intent, they argue that because N.J.S.A. 40:11–1 and 46–14 require all municipal employees to reside in the municipality for which they work,[11] the legislature must have used the same rationale for enacting those statutes as when it enacted N.J.S.A. 40:47–5. We pause briefly to note that these provisions are distinct and apparently overlapping; however, we reject this argument for the same reasons expressed above.

Plaintiffs next argue that the decision in Shapiro v. Thompson, *supra,* should control the result in this case. While we agree with plaintiffs that *Shapiro* provides the proper burden of proof, the Court finds that case to be inapposite on its facts. A durational residency requirement was successfully attacked in *Shapiro,* not a continuing residency requirement. Likewise, in Keenan v. Board of Law Examiners, *supra,* a three-judge court struck down a state bar rule requiring one year of residence prior to taking the bar examination. In both cases the state interest lay in determining bona fide residency, an interest clearly outweighed by Shapiro's need for welfare payments to obtain the necessities of life and Keenan's ability to practice his profession. Therefore, the Court does not consider the precedents of these durational residency cases to be controlling. Moreover, the Supreme Court in *Shapiro* took pains to limit the sweep of its decision by expressly disavowing any intent to invalidate all "waiting-period or residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth." Shapiro v. Thompson, *supra,* 394 U.S. at 638 n.21, 89 S.Ct. at 1333. (emphasis deleted). These remarks were not merely an idle reminder that courts decide only what is before them. Rather, the Supreme Court foresaw the far-reaching implications of its decision and wished to warn courts against lump-

---

11. Except as otherwise provided by law, every person holding an office, the authority and duties of which relate to a county only, shall reside within the county, and every person holding an office, the authority and duties of which relate to a municipality, shall reside within the municipality . . . N.J.S.A. 40:11–1.

Whenever an officer of a municipality shall cease to be a bona fide resident therein, or whenever the resignation of any such officer shall have been accepted by the proper authority, a vacancy in his office shall immediately exist, and he shall not exercise any of the duties of the office theretofore held by him. The municipality, by its proper authority, shall immediately proceed to fill the vacancy in the manner and form prescribed by law . . . N.J.S.A. 40:46–14.

ing together diverse interests in residence cases.[12]

■■■■■ Plaintiffs also urge upon us their reading of other statutory provisions which, they say, disprove or obviate the interest of New Jersey in requiring continuous residence under N.J.S.A. 40:47–5. They cite N.J.S.A. 40:47–3.3, which permits a municipality to waive by ordinance either the durational or permanent residence requirements if the governing body first makes a factual determination that adherence to such requirements "would seriously impede its ability to establish and maintain competent personnel for its police force or paid fire department." Plaintiffs argue that the retention of this option for "political expediency"[13] reveals the true, noncompelling nature of the state interest in demanding residency. In essence, plaintiffs assert that the standard is so vague that it invites abuse. While this Court expresses no opinion concerning the validity of N.J.S.A. 40:47–3.3 we believe that the standard laid down by the legislature is not so uncertain that it belies the impor-

tance of the residency requirements of N.J.S.A. 40:47–5. Having a resident police force and fire department may be a compelling interest, but if it is impractical to recruit residents or those willing to become residents, it is equally essential that the municipality look elsewhere for police and firemen.[14] Where a statute is valid on its face, a party may not complain of possible unconstitutional applications of the law in the future. We therefore reject plaintiffs' claim that the possibility of political chicanery with regard to the waiver provision of N.J.S.A. 40:47–3.3 can by indirection bring about the fall of the residency requirement of N.J.S.A. 40:47–5. The emergent conditions which would justify a municipality's invocation of the waiver rule would also, we think, amply justify the greater freedom of mobility enjoyed by police and firemen working within such a municipality and would not create an unconstitutional classification.

Plaintiffs argue that the proper tactic for urban disorder and crime control lies in inter-municipal cooperation and cite for authority N.J.S.A. 40:47–12.1 and 12.12. These provisions allow police

12. Some courts have already indicated that they have so interpreted *Shapiro*. In Kirk v. Board of Regents, 273 Cal.App.2d 430, 78 Cal.Rptr. 260 (1969), the California Court of Appeals held that a regulation classifying students as residents or non-residents for the purposes of computing tuition was valid. A student was considered a "resident" only if he or she were a bona fide resident of California for one year prior to admission. The Court of Appeals refused to equate the lower tuition costs denied Kirk with the human sustenance granted to Mrs. Shapiro by way of her welfare payments. To cut off a needy person from the only available means of survival would surely have a more chilling effect upon the exercise of fundamental rights than a simple hike in one's tuition rate. Plaintiffs, on the other hand, rely heavily upon Donnelly v. City of Manchester, 274 A.2d 789 N.H.1971), where the New Hampshire Supreme Court struck down a town ordinance requiring permanent residence within one year following appointment to office of all public employees. Apparently, the defendant town relied on the right-privilege doctrine and the corollary pub-

lic coffer doctrine, both of which the Court had little trouble in dismissing after citing *Shapiro*. The town was unable to cite any reason, compelling or otherwise, which demanded that plaintiff, a school teacher, live within city limits. We, too, have rejected the right-privilege and public coffer doctrines, and the Court feels that on the facts presented, the New Hampshire Supreme Court had no alternative but to invalidate this unjustified town residency ordinance. Nothing in *Donnelly*, however, persuades us that we have incorrectly balanced the very different interests before us in this case.

13. N.J.S.A. 40:47–3.3 is certainly not a political anachronism left over from the bygone days of political dole. It was enacted as N.J.Laws 1966, c. 292 § 1.

14. Even criminal laws are to be upheld against claims of potential abuse in their operation so long as the law is valid on its face and has been fairly applied to the individuals who challenge the law. Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927).

and fire department officials to call upon other municipalities for assistance during times of emergency.[15] This law might be cited to rebut the proximity argument, were that still in issue, but we have already explicitly excluded that theory from our consideration. Note 6, *supra*. The Court would not be prepared to admit, in any event, that New Jersey, once it has adopted a legislative objective, must reduce its intention to a single scheme or device. The tremendous infusion of federal and state tax dollars into the municipal law enforcement system has little if anything to do with the arguments in favor of direct association and identification with the community upon which the Court has based its conclusion.

Finally, plaintiffs strongly contend that invalidation of N.J.S.A. 40:47–5 will promote the best interests of New Jersey because of the announced intentions of numerous New Jersey mayors to begin effective enforcement of the residency requirement should this Court uphold it. We are advised by plaintiffs that the mayors of Camden, Trenton, and Paterson have planned the immediate replacement of non-resident police and firemen should the law be sustained, and that the mayors of other cities will take the matter under serious consideration. Plaintiffs regard this as "reckless . . . petty provincialism," and urge the Court to consider the impact of our decision in terms of the loss in man-

power, detriment to police and firemen morale, and the diminished capacity for law enforcement service to the community at large. This Court cannot believe that upon the rendering of its decision, municipalities will not allow police and firemen a period of grace in which to move into their communities of employment. No one would gain by en masse vindictive firings and because we uphold N.J.S.A. 40:47–5, we are powerless to stay its enforcement. Should the law be enforced with less than an even hand, however, a new proceeding to stay its enforcement might be appropriate.[16]

An order, in conformity with the conclusions herein reached, will be filed by the Court.

15. In the event of emergency or widespread conflagration, it shall be lawful for the chief or other head of any municipal fire or police department or any park police department or system, upon the request of the chief of the fire or police department or the mayor of any municipality for assistance outside the normal territorial jurisdiction of the department to which such request is directed, to provide and render such assistance, by supplying fire and police aid, or both, in the protection of life and property, or to assist in quelling any riot or disorder or in suppressing any conflagration, and while so acting the members of the fire or police department supplying such aid shall have the same powers and authority as have the members of the fire or police department of the municipality in which such aid is being rendered . . . . N.J.S.A. 40:47–12.1.

"Emergency" as used herein shall include any unusual conditions caused by fire, weather or any circumstances or situation including shortages in the personnel of the police or fire department caused by vacancies, sickness or injury, or by the taking of accrued vacation or sick leave or both, whereby the safety of the public is endangered or imperiled, as shall be determined within the sole discretion of the officer, board or official having charge of the police or fire department in any municipality. N.J.S.A. 40:47–12.12.

16. The Governor has already introduced a bill in the New Jersey Legislature which would, in effect, establish a period of grace for non-resident police and firemen.