335 A.2d 607 (1975)
STATE of Maine
v.
Paul P. NORTON and David Mahonen.
Supreme Judicial Court of Maine.
February 26, 1975.
*608 Galen P. LaGassey, County Atty., Rockland, Charles K. Leadbetter, Asst. Atty. Gen., Crim. Div., Augusta, for plaintiff.
Pine Tree Legal Assistance, Inc. by Alexander P. Humphrey, IV, Bangor, for defendants.
Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, ARCHIBALD and DELAHANTY, JJ.
WEATHERBEE, Justice.
These appeals by two defendants from their convictions in the Superior Court in Knox County challenge the validity of a municipal ordinance for regulation and licensing of shellfishing enacted by the town of North Haven. The State asserts that the ordinance was enacted under the authority granted to municipalities by 12 M. R.S.A. §§ 4251 and 4252. This law permits municipalities to enter into shellfish conservation programs, alone or with other municipalities, with the Commissioner of the Department of Marine Resources, and to appropriate money for these purposes. Upon its appropriation of such money, the municipality is authorized to
"enact a municipal ordinance fixing the time when clams, quahogs and mussels may be taken from any or all of the coastal waters and flats within the municipality, except for those areas closed by regulation of the commissioner under section 3503 or section 3504. The ordinance must have the written approval of the commissioner before adoption and that approval must be filed with the municipal clerk prior to adoption. The ordinance may provide limitations on the amount of clams, quahogs and mussels which may be taken within the municipality, and may provide that municipal licenses be required for the taking of any such species within the municipality, and may determine the qualifications for the license, including residence requirements, and may fix the license fees. The ordinance may provide for the size *609 of soft-shell clams which may be taken from the flats within the municipality." 12 M.R.S.A. § 4252.
An earlier attack upon the constitutionality of this statute was made before us in State v. Alley, Me., 274 A.2d 718 (1971). Thenas herethe Appellant questioned the authority of the statute to empower municipalities to discriminate between residents and nonresidents in the harvesting of shellfish. We then upheld the constitutionality of the statute.
These Defendants distinguish the factual issues here from those in Alley and urge upon us several reasons why they believe that the North Haven ordinance cannot stand.
The parties have reduced the procedural developments and the trial testimony to a Stipulated Narrative Statement of Facts. North Haven is an island community in Penobscot Bay which is served year-round by a public ferry to the mainland. It contains several clam flats of which the most productive (perhaps the most productive in the general area) is that located in Southern Harbor. The general Penobscot Bay area is one in which many people earn their livelihoods digging clams. However, the number of nonresident diggers in Southern Harbor is limited by the practical considerations of its distance from the mainland, the inconvenience of ferry schedules and the cost of transportation.
In October, 1971, the town of North Haven made application to the Commissioner for approval of its shellfish conservation plan, which represented that the town would make assistance available for surveys and for testing certain flats as to productivity and production and which further provided that conservation and trial projects might be initiated. The plan was approved by the Department. However, at the time of the enactment of the ordinance and at the time of trial no such surveys or tests had been made.
The town then enacted the ordinance now in question which establishes a resident license fee of $5.00 and a nonresident fee of $50.00 for shellfish digging on North Haven Island, except that both residents and nonresidents are permitted to take one peck of shellfish a day for their personal or family use with the further exception that nonresidents are prohibited entirely from shellfishing in Southern Harbor.[1] At the time of trial the town had issued one nonresident and six resident licenses but only two of the residents held state licenses to dig commercially.
These two Defendants, nonresidents of North Haven, agree that they did dig clams in Southern Harbor on the day charged but insist that the town could not effectively enact an ordinance which would discriminate against residents of other communities of the state. Their argument is: first, that the statute, 12 M.R.S.A. § 4252, does not authorize a municipality to exclude nonresidents from specified clam flats which remain open to residents and that if it does purport to do so, it cannot do so constitutionally; second, that such authority, if it could be found in the statutes, cannot be exercised by the municipality of North Haven since the prior actions of that municipality have irrevocably dedicated Southern Harbor to the public; third, that the ordinance is unconstitutional, both on its face and as applied, in that it violates the Defendants' rights to travel, live, and work where they choose; and fourth, that the ordinance violates their constitutional rights to equal protection of the law.

Legislative and Judicial History
It has long been understood that by virtue of the Colonial Ordinance of 1641 the title to land between the flux and *610 reflux of the tide is held by the owner of the upland subject to "the right of the public to use it for purposes of navigation and fishing." Moulton v. Libbey, 37 Me. 472 (1854); Marshall v. Walker, 93 Me. 532, 45 A. 497 (1900); Blaney v. Rittall, Me., 312 A.2d 522 (1973). Our Court has consistently taken the position that the title to the shellfish in these tidal waters is in the State as representative of the people, exercising not only rights of sovereignty but also property. Moulton v. Libbey, supra; State v. Leavitt, 105 Me. 76, 72 A. 875 (1909); see also Comm. v. Hilton, 174 Mass. 29, 54 N.E. 362 (1889). In this capacity of trustee for the people, the State has the power to regulate and control its shellfisheries. State v. Peabody, 103 Me. 327, 69 A. 273 (1907); State v. Leavitt, supra. This was also the rationale as to a state's wildlife followed by the United States Supreme Court in McCready v. Virginia, 94 U.S. 391, 394, 24 L.Ed. 248 (1876) and reiterated in Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896).
From the time of the Colonial Ordinance of 1641 it was the policy of Massachusetts and, since our statehood, of Maine to consider the inhabitants of towns with clam flats as entitled to preferential treatment in their enjoyment and responsibility in their management. State v. Leavitt, supra; Commonwealth v. Hilton, supra. The Ordinance itself declared that
"`every inhabitant that is a householder shall have free fishing and fowling in any great ponds, bays, coves and rivers, so far as the sea ebbs and flows within the precincts of the town where they dwell, unless the freemen of the same town or the general court have otherwise appropriated them.'" 105 Me. at 80, 72 A. at 877.
Our first Legislature placed the regulation of local clam harvesting in the respective municipal officers but included an assurance that inhabitants of the community may take shellfish at any times for their personal and family use.
P.L.1821, Vol. II, ch. 179, § 3 prohibited the taking of clams except
"[t]hat every inhabitant of each of the said towns without such permit shall have a right to take such other shell fish from their beds therein for the use of his or her family . . . ."
This pattern of legislative reliance upon a town's interest in a local resource to assure proper seasonal and quantitative harvesting combined with preferential right for a town's residents as against nonresidents was repeated, in slightly varying language throughout the state's history.
In 1903 the controlling statute read:
"Any town may at its annual meeting fix the times in which clams may be taken within its limits, and the prices for which its municipal officers shall grant permits therefor; and unless so regulated by vote, residents of the town may take clams without written permit. But without permit any inhabitant within his own town, or transient person therein, may take clams for the consumption of himself and family. This section does not apply to hotel keepers taking clams for the use of their hotels, . . . ." P.L.1901, ch. 284, § 37.
In 1906 the enabling statute (R.S.1903, ch. 41, § 34) was the same in all pertinent respects.
The town of Lamoine (purporting to act under the 1901 statute) and the town of Cushing (relying on the 1906 law) each enacted ordinances which effectively barred nonresidents from all digging on their respective flats. Each prosecuted a nonresident for violation of the ordinance and each nonresident defendant claimed the ordinance denied him equal protection. In each case this Court held that the enabling statutes were not broad enough to authorize a complete exclusion of nonresident diggers and did not reach the constitutional issue. State v. Bunker, 98 Me. 387, 57 A. 95 (1903); State v. Peabody, supra.
*611 However, the equal protection issue rose again soon. The Legislature had accorded residents of the town of Scarboro unique statutory privileges by special legislation which closed the flats of Scarboro to all digging between April 1 and October 1 except by residents taking for their family use and local hotel keepers taking for hotel use. In State v. Leavitt, supra, a nonresident, non-hotel-keeping defendant who was convicted under the ordinance claimed on appeal that it denied him equal protection.
The Court reaffirmed the concept of the State's representation of its citizens in their ownership of the shellfish in the flats between high and low tides and the responsibility and power of the Legislature to regulate and control these fisheries for the benefit of all the people of the State. Moulton v. Libbey, supra. The Court was satisfied that circumstances might well require diversified treatment of different shellfish areas and that the Legislature could reasonably conclude that some limitation upon the quantity of clams to be taken in Scarboro was necessary (perhaps in part because of its proximity to large centers of human population) in order to avoid the destruction of the clam fishery there.
The Court felt that, while this goal might be attempted by closing the flats to all fishing for a period, this method seemed impracticable and was presumably rejected by the Legislature which chose, instead, to limit the number of persons fishinga reasonable choice, the Court felt, in view of the fact that "[i]t is evident that all the inhabitants of the state cannot take clams in Scarboro without limit."
The Leavitt Court concluded that the State's interest in the clam population was an alienable property right and that the State, in the exercise of its power of regulation, may grant inequality of treatment of its citizens if for a proper governmental purpose and if the difference bears a just and proper relation to the attempted classification. The Court said:
"Since it must be assumed that the public interest required some limitation upon the right of clam fishing, it does not seem to us that it is unreasonable or arbitrary for the state having a proprietary interest as well as a governmental power all for the public benefit to give the preference to those whom the law for more than two hundred and fifty years has given a preference, and who were enjoying a preference when the fourteenth amendment was adopted, namely the inhabitants of the town within which the fisheries are located. The discrimination between them and the inhabitants of other towns seems to us to `bear a just and proper relation' to the difference in situation, in locality, and in the actual enjoyment of prior legal rights or privileges. It is not unreasonable that they to whose doors nature has brought these `succulent bivalves' shall be entitled to them before those who are less favorably situated whenever there must be restriction. And we do not think that the legislative recognition of this existing superiority in situation and privilege denies to others the equal protection of the law." 105 Me. at 85, 86, 72 A. at 879.
Apparently assured of the validity of its philosophy, the Maine Legislature continued to enact shellfish regulation statutes which gave residents preferred digging privileges over those given nonresidents, and it was more than 40 years before the equal protection issue arose again in connection with digging in the littoral. It arose from prosecution under a statute (R.S.1944, ch. 34, § 77) which prohibited the taking of bloodworms in the town of Woolwich without a license from municipal officers and which specifically provided that nonresidents were not eligible for such a license. The Court held that the constitutional power of the Legislature to authorize towns to exclude nonresidents from the local flats had been settled by Leavitt. (It was actually the statute itself which barred that nonresident and not the *612 ordinance.) State v. Lemar, 147 Me. 405, 87 A.2d 886 (1952).
Following this, many Legislatures (presumably familiar with the holdings of Leavitt and Lemar) apparently concluded that in many instances the protection of the clam populations and the traditional local interest in them justified a complete barring by the Legislature itself of digging by nonresidents (or nonresidents who did not pay local real estate taxes) in certain areas. In 1944 the Legislature, by Private and Special Legislation and sometimes by public law, directly gave these exclusive rights to inhabitants of ten towns, in 1947 to inhabitants of eleven, and in 1949 to inhabitants of fifteen. A typical one of these acts was P. & S.L.1949, ch. 59 which made it unlawful for a nonresident not paying a local real estate tax to dig clams in the town of North Haven.[2]
The 1959 revision of our Sea and Shore Fisheries laws authorized municipalities to license local cultivation of clams and made towns with clam harvesting ordinances responsible for their enforcement. P.L.1959, ch. 331, §§ 46-62. The same Legislature also revised the Private and Special Laws concerning clam digging in certain towns, continuing the policy of barring nonresidents in certain areas or permitting the towns to do so by ordinance. P. & S.L. of 1959, chs. 154, 155.
Finally, in 1963 the lawmakers took the latest step in reordering the responsibility for preservation of the clamming industry when it enacted P.L.1963, ch. 277, entitled "An Act Repealing the Town Clam Laws and Authorizing Special Privileges for Cooperating Towns." This Act amended the 1959 revision in these respects (concerning clams):
(1) It authorized municipalities to raise money for a shellfish conservation program.
(2) It limited the right of municipalities to enact ordinances to regulate and license clammingenjoyed by towns since 1822to those towns which had "raised or appropriated money within 2 years next prior to acting under this section for a shellfish conservation program . . . ."
(3) It added a specific authorization to the municipalities to "determine the qualifications for the license, including residence requirements"the language with which we are now particularly concerned.
(4) It repealed the portions of Private and Special Laws of 1959, chs. 154 and 155 which had specifically excluded nonresident digging or had granted special privileges to residents.

Interpretation of the Enabling Act
The Defendants insist that the statutory authorization to the municipalities to "determine the qualifications for the license, including residence requirements" falls short of showing a clear intention to delegate to the towns the right to exclude nonresidents from local clam flats (even if, in fact, the State possesses such power to do so, which the Defendants deny). Because the statute carries penalties for persons convicted of violation of ordinances enacted under it, it must receive a strict construction. State v. Wallace, 102 Me. 229, 66 A. 476 (1906).
In Alley we examined the identical statute but the attack was confined to *613 its constitutionality and that of the ordinance and the Alley ordinance restricted but did not entirely prohibit nonresident digging. Now, in spite of the absence of express and positive authorization to towns to exclude nonresidents completely, our review of the deep background against which the 1963 Legislature acted[3] leaves us convinced that the words "Qualifications for the license, including residency requirements" were intended to leave to the municipalities the determination of whether nonresidents should be permitted to dig in local flats at all and, if so, under what conditions.
Ever since 1822 statutes had given municipalities the power to enact ordinances to "fix the times in which clams may be taken" and the prices and number to be issued within their territorial limits, and these statutes granted residents of the respective municipalities varied privileges to take clams without licenses at times when nonresidents could not shellfish. In Bunker and Peabody our Court found that this right to license and regulate the times for taking fell short of authorizing the exclusion of nonresidents. The Legislature itself then specifically barred certain seasonal digging by nonresidents in Scarboro, and the Court in Leavitt upheld the constitutionality of the Act.
During the following half century and more, the Legislature followed up the successful accomplishment of its purpose in Scarboro by enacting dozens of Private and Special Laws (and some Public Laws) which either directly limited or barred digging altogether by nonresidents or authorized towns to do so by ordinance. The revision of the Sea and Shore Fisheries laws in 1959 (P.L.1959, ch. 331, §§ 46-50) dropped the general grant of special privileges to residents but the Legislature's determination to favor local residents, in many instances to the complete exclusion of nonresidents, was concentrated in the enactment of Private and Special Laws, chs. 154 and 155 which contained some 73 sections regulating (or authorizing regulation of) clamming in some 73 individual municipalities to the advantage of the residents and the disadvantage of nonresidents.
Finally, in 1963, when the Legislature repealed the many separate Acts granting or authorizing special privileges for residents in individual towns and at the same time added by amendment (to the municipalities' powers to regulate and license) the words "and may determine the qualifications for the license, including residence requirements," the Legislature, we are certain, intended to turn over to the municipalities from biennium to biennium the entire question whether their nonresident fellow citizens should be permitted to dig in local flats, and if so, under what conditions.[4]
The ordinance purported to exercise powers which the enabling Act purported to delegate. But could the Legislature constitutionally delegate authority to discriminate at will between residents and nonresidents?
Inasmuch as we believe that the overriding purpose of the Legislature was that of conservation, we do not believe the Legislature intended that this authority should be unqualified. Indeed, it could hardly do so, constitutionally, and the Legislature is presumed to have intended to act within constitutional limitations. We read into the statute a legislative intention that municipalities may exclude nonresidents from their clam flats only when, and *614 to the extent, it is reasonably necessary for the proper conservation of this valuable resource.

Constitutionality of the Enabling Statute
The statute authorizes the municipalities to discriminate between their own residents and those of other municipalities in order to conserve and protect these resources when reasonably necessary.
In testing the constitutionality of acts of our Legislature, we frequently commence with the statement of Justice, later Chief Justice, Fellows:
"`In passing upon the constitutionality of any act of the legislature the Court assumes that the legislature acted with knowledge of constitutional restrictions, and that the legislature honestly believed that it was acting within its rights, duties and powers. All acts of the legislature are presumed to be constitutional and this is a "presumption of great strength." . . . The burden is upon him who claims that the act is unconstitutional to show its unconstitutionality.. . . Whether the enactment of the law is wise or not, and whether it is the best means to achieve the desired result are matters for the legislature and not for the Court.'" (Citations omitted.) State v. Fantastic Fair & Karmil, 158 Me. 450, 466, 467, 186 A. 2d 352, 362, 363 (1961).
Unquestionably, these Defendants have been disadvantaged by being barred from digging in Southern Harbor. Inequality of treatment is not forbidden if it is based upon an actual difference bearing some substantial relation to a proper public purpose which is sought to be accomplished when it is a "proper discrimination based on the requirement of the commonweal." In re Stanley, 133 Me. 91, 97, 174 A. 93, 97 (1934). See also Portland Pipe Line Corp. v. Environmental Improvement Commission, Me., 307 A.2d 1, 22 (1973); State v. Fantastic Fair & Karmil, supra; State v. King, 135 Me. 5, 188 A.2d 775 (1936).
"The traditional test requires the difference to be rationally related to a permissible goal. But if a fundamental personal interest is involved, the difference is legitimately defensible only if it furthers a compelling state interest." Cole v. Housing Authority of the City of Newport, 435 F.2d 807, 809 (1st Cir. 1970). See also Westberry v. Fisher, 297 F. Supp. 1109 (S.D.Me.1969).
The Legislature, as the sovereign-trustee of the people's property, has obligation to manage the shellfish populations to preserve, as far as possible, their benefit for all the people. But this does not mean that every citizen in the State must have identical opportunity with every other citizen to harvest clams in every area where clams are found because equality of opportunity might result in the destruction of some vulnerable clam populations to the detriment of all the people.
One of the techniques of management, appropriate in some instances and not in others, we understand, is that of limitation upon the quantity harvested. This limitation may be accomplished by creating closed seasons, by establishing daily bag limits or by limiting the number of persons allowed to dig in an area. A particular method which would be appropriate in some areas might not be in others. In some particularly vulnerable areas daily bag limits, in order to be effective, might need to be so small as to be of no practical value to individual diggers. Admittedly, the limitation of the number of diggers might be accomplished in other ways than by barring nonresidentssuch as by imposing sufficiently high license fees but with likely undesirable results to the market and to individual diggers.
We found in Alley that the statute in issue has an underlying strong, proper governmental purpose of protection of shellfish. The Legislature, aware of the ever mounting pressures upon clam populations caused by a reduction of suitable habitat due to pollution, magnified frequently by *615 the ravages of nature,[5] combined with an expanding market, has concluded that the problem can best be managed on a local level by a concerned citizenry with a substantial stake in the endeavor (but with expert guidance by the Commission). The Legislature has apparently accepted the proposition expressed in Leavitt that when conservation considerations demand that a limitation be placed upon the number of diggers, the governmental purpose may, under appropriate circumstances, be achieved best by choosing local residents as the permitted group.
We realize that the early rationale that tide waters and the fish in them (as far as they are capable of ownership) are the property of the State (McCready v. Virginia, supra) has undergone considerable erosion when examined in the light of recent considerations of equal protection. In Toomer v. Witsell, 334 U.S. 385, 68 S. Ct. 1156, 92 L.Ed. 1460 (1948) it was held that a state may not discriminate against residents of another state fishing for shrimp in its tidal waters except as such selective restrictions are based upon recognizable peculiar sources of evil or bear a relation to the costs of management and conservation which are borne by resident fishermen. In Toomer, however, the Court was dealing with a State's claimed right to a preferential enjoyment of free swimming, migratory fish temporarily in its waters[6] a situation which we consider distinguishable from that of a State's responsibilities in management of shellfish which have fixed habitats in depletable beds. We consider that the McCready Court's observation that planting of nonmigratory shellfish (oysters) in soil covered by waters owned by the State is no different in principle from planting corn on dry land is still valid. 94 U.S. at 396, 24 L.Ed. at 248.
While these Courts found no relationship between the purposes of conservation and discrimination against nonresidents it does not seem to usand the cases do not say that such a connection can never be established. Rather, we note that the Courts in the cases above have not found such a relationship in the particular instances facing them. We believe that such a relationship can be found here.
We are satisfied that the State has a compelling governmental interest in the conservation of its clams. We cannot say that its attempt to achieve this purpose by, in part, authorizing municipalities to apply the resident-nonresident standard in proper circumstances as a device to limit digging is not substantially related to this proper public purpose.
The Defendants have failed to overcome the presumption of constitutionality of the statute.

Dedication
It is also urged by Defendants that the fact that the town of North Haven had failed to bar any members of the public from its clam flats until 1971, when this ordinance was enacted, constitutes an irrevocable dedication of its shellfishing privileges to public use by acquiescence. It would appear clear that no such dedication can be attributed to the town (if in fact a dedication can be found through noninterruption of continued use). From 1905 to 1963 the Legislature itself undertook, by Private and Special Legislation, to control the taking of clams on North Haven and for 59 years it specifically barred all nonresident digging on that island. P. & S.L. 1905, ch. 351; P. & S.L.1949, ch. 59; P. & S.L.1959, ch. 155, § 48.
We cannot find dedication in the town's failure to prepare its conservation program and enact its ordinance under the 1963 law until 1971.

*616 The Constitutional Right to Travel and Work

The United States Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969) held that the constitutional right to travel may be "impinged" by statutes only if it is necessary to do so to promote a compelling governmental interest. The Court found no such interest in statutes which denied welfare assistance to applicants who had not resided in the jurisdiction at least one year.
The Judges of the First Circuit found that two new arrivals in town were similarly denied their constitutional right to travel by a regulation which admitted to a low-rent public housing project only applicants who had been residents of the community for at least two years. Cole v. Housing Authority of the City of Newport, supra.
The applicants in these federal cases were residents in the offending jurisdictions. The very purpose of the attempted restrictions was to prevent indigent people such as they from taking residence in the new jurisdictions and demanding public assistance as eligible citizensthe purpose, in fact, was to inhibit migration. As Chief Judge Coffin reminds us in Cole, the United State Supreme Court used "travel" in the sense of migration with intent to settle and abide. Not all residency requirements are forbidden.[7]
Inasmuch as our disposition of this appeal makes it unnecessary for us to reach the question of the constitutionality of the ordinance, its effect upon these particular Defendants does not require discussion.
But assuming that this sort of travel is constitutionally protected as such, the Court in Shapiro cautioned the reader that it did not mean its holding to suggest that all residency requirements are prohibited some may promote compelling state interests and others may not actually be penalties on the right to travel.
Similarly, the Defendants concede that the constitutional objections which they raise as to tying opportunity to work to residency (Donnelly v. City of Manchester, 111 N.H. 50, 274 A.2d 789 (1971)) may be overcome if a proper relationship exists between the restriction and a proper governmental purpose. Krzewinski v. Kugler, 338 F.Supp. 492 (D.C.N.J.1972).
We are satisfied that the State's interest in the conservation of its clams together with the desirability of limiting the number of diggers on proper occasions in order to further that purpose furnishes a compelling State interest which permits the State to authorize the municipalities to bar digging by nonresidents, on proper occasions, also.

Validity of the North Haven Ordinance
Here the statute in question, 12 M.R.S. A. § 4252, is a measure granting authority to discriminate against nonresidents of a town. That conservation of shellfishthe stated aim of the statutemight be so served in particular situations does not strike us as impossible.
However, the ordinance of the town of North Haven enacted under the authority of section 4252 is also in question. In order to meet statutory authorization and withstand constitutional attack, the ordinance itself must not be without a reasonable relationship to the purposes of conservation. Although we approach the ordinance as well as the statute with a presumption of validity, nevertheless, as we noted above, this presumption does not preclude us, first, from questioning the relationship of the exclusion of nonresidents to the ends of shellfish conservation as bearing on the reasonable necessity of such exclusion.
*617 The Defendants have satisfied us that no such reasonable necessity existed as would bring this ordinance within the authority granted by the enabling act. As stipulated to in the statement of facts, the town of North Haven, before passing the ordinance, had made no determination that the shellfish of Southern Harbor were in any way endangered from excessive digging and none had been made at time of trial. Rather than establishing any such danger to the clams, the record reveals that the flats of Southern Harbor are particularly productive, that because of the inaccessibility of the island, only a limited number of diggers sought out the clams of Southern Harbor. At the time of trial only two persons held the combination of town and state licenses which would permit them to dig commercially in Southern Harbor. Further, Appellants testified that exclusion of nonresidents seemed to cause no observable increase in the number of clams, that there seemed to be no more clams a year after promulgation of the ordinance than before. It is stipulated by counsel that expert testimony was presented at trial by a qualified biologist to the effect that "there was no causal connection between the productivity of a particular flat and whether or not it is subject to a municipal ordinance" and to the effect that "digging pressures exert only a de minimis influence upon shellfish mortality, particularly when compared to natural factors." We do not intend to imply by this reference to the expert testimony in this case that a showing might never be made of causal connection between a restrictive ordinance and protection of clam populations. Here, however, on these facts, it is impossible to find that the ordinance exclusion of nonresidents from digging in Southern Harbor was reasonably necessary to protect the clams from unacceptable digging pressures there.
We therefore hold, since no reasonable relationship to conservation justifies the enactment of the ordinance which excludes nonresidents from digging in Southern Harbor, that the part of the ordinance which does exclude nonresidents from so digging is without statutory authorization and is therefore invalid.
It appears to us, however, that the objectionable provision of the ordinance (Section III) is severable and that the balance of the ordinance (which is not under attack) remains effective. 1 M.R.S.A. § 71 (8).
In that we find Section III of the ordinance to be outside the authorization of the enabling statute, no further discussion of the constitutional principles involved is required.[8]
The entry will be:
Appeal sustained.
All Justices concurring.
WERNICK, J., did not sit.
NOTES
[1] "III. Area to be closed. The following area to be closed to all non-resident digging or taking of shellfish: from the end of Crabtrees' Point upto and including Southern Harbor. (Ames Point)"
[2] Clear evidence of the Legislature's belief that complete exclusion of nonresidents is in some instances the only feasible way to save clam populations from depletion is found in a 1961 emergency measure. That Legislature enacted as an emergency measure a Private and Special Act which limited digging of clams in the towns of Cushing, Friendship and Thomaston to residents or taxpayers of the respective towns, the Emergency Preamble reciting that the immediate effectiveness of the Act was necessary "to prevent the depletion" of the clams and "in the best interests of conservation". Private and Special Laws 1961, ch. 115.
[3] Statutory history is relevant in throwing light upon the meaning intended by a Legislature. Hayes v. State, Me., 247 A.2d 101 (1968). Furthermore, the Legislature is presumed to have in mind previous relevant judicial decisions. Maine State Housing Auth. v. Depositors Trust Co., Me., 278 A.2d 699 (1971).
[4] "The whole body of previous and contemporaneous legislation upon a particular topic should be considered in interpreting any statute." Finks v. Maine State Highway Commission, Me., 328 A.2d 791, 797 (1974).
[5] Overdigging is not the only threat to clam populations, we realize.
[6] See also Russo v. Reed, 93 F.Supp. 554 (S.D.Me.1950).
[7] We note, however, that these Defendants did not migrate to North Haven with the intention to settle and abide there and the record does not remotely suggest that they have any desire to do so. Their wish is to retain the benefits available from residency in their own municipalities but to be free also to dig the clams in North Haven when they choose.
[8] These Defendants have confined their attack on the ordinance to that part of it which excludes nonresidents from digging in Southern Harbor. As we have found this section of the ordinance to be invalid we do not reach the constitutionality of this section as such, or that of other portions of the ordinance. We do note that the Defendants make brief reference to the fact that the ordinance defines "resident" as meaning

"a person who has resided in the State of Maine for at least six (6) months next prior to the time his claim of such residence is made, and who has resided in this municipality for at least three (3) months next prior to the time his claim of such residence is made."
and assert that if the Defendants should desire to forego their present residences and move to North Haven they could not dig immediately in Southern Harbor as other residents could.
We do not intend our disposition of this case to suggest any opinion that this durational residency requirement does or does not meet constitutional standards of equal protection as applied to either section III or the differentiation of license fees between resident and nonresident.
Concerning durational residency requirements as to voter registration, see Opinion of the Justices, Me., 303 A.2d 452 (1973), and as to qualification for State lobster and crab fishing license, see Massey v. Apollonio, 387 F.Supp. 373 (D.C.Me.1974) ( a three Judge Courtopinion filed 1974).